777 N.W.2d 327 (2010)
279 Neb. 238
CITY OF FALLS CITY, Nebraska, appellee and cross-appellant,
v.
NEBRASKA MUNICIPAL POWER POOL, a Nebraska nonprofit corporation, appellant and cross-appellee,
J. Gary Stauffer et al., appellees and cross-appellants,
Central Plains Energy Project, appellee, cross-appellee, and cross-appellant, and
American Public Energy Agency, intervenor-appellee.
No. S-08-1184.
Supreme Court of Nebraska.
January 15, 2010.
*329 Daniel E. Klaus and David J.A. Bargen, of Rembolt Ludtke, L.L.P., Lincoln, for appellant.
*330 James P. Fitzgerald and James G. Powers, of McGrath, North, Mullin & Kratz, P.C., L.L.O., Omaha, for appellees J. Gary Stauffer et al.
Robert W. Mullin and David S. Houghton, of Lieben, Whitted, Houghton, Slowiaczek & Cavanagh, P.C., L.L.O., Omaha, and Douglas E. Merz, of Weaver & Merz, Falls City, for appellee City of Falls City.
James M. Bausch and Terry R. Wittler, of Cline, Williams, Wright, Johnson & Oldfather, L.L.P., Lincoln, for appellee Central Plains Energy Project.
Bartholomew L. McLeay and Heather H. Anschutz, of Kutak Rock, L.L.P., Omaha, for intervenor-appellee American Public Energy Agency.
W. Scott Davis and Amanda A. Dutton, of Baylor, Evnen, Curtiss, Grimit & Witt, L.L.P., Lincoln, for amicus curiae National Public Gas Agency.
William F. Austin, of Erickson Sederstrom, P.C., Omaha, for amicus curiae League of Nebraska Municipalities.
HEAVICAN, C.J., CONNOLLY, GERRARD, STEPHAN, and McCORMACK, JJ.
HEAVICAN, C.J.

INTRODUCTION
Nebraska Municipal Power Pool (NMPP) appeals from a final judgment granted by the Lancaster County District Court in favor of the City of Falls City, Nebraska (Falls City). J. Gary Stauffer, John Harms, Evan Ward (collectively individual defendants), and Central Plains Energy Project (CPEP), defendants-appellees, have cross-appealed. Falls City cross-appeals. The American Public Energy Agency (APEA) settled its suit, and its claims are no longer a part of this case. We reverse the decision of the district court and remand the cause with directions to dismiss.

FACTS
NMPP was created in 1975 as a nonprofit corporation with the purpose of idea generation, research, analysis, administration, and the creation of other entities to carry out these activities. NMPP has a 16-member board of directors made up of representatives from the participating municipalities. Falls City is a member of NMPP.
The first entity created by NMPP in 1981 was the Municipal Energy Agency of Nebraska (MEAN), under the Municipal Cooperative Financing Act, see Neb.Rev. Stat. §§ 18-2401 to 18-2485 (Reissue 2007 & Cum. Supp. 2008). NMPP created MEAN in order to obtain efficient sources of electricity for participating communities. The National Public Gas Agency (NPGA) was created in 1991 by NMPP in order to secure natural gas for the participating municipalities. NPGA is an interlocal agency created under the Interlocal Cooperation Act, see Neb.Rev.Stat. §§ 13-801 to 13-827 (Reissue 2007 & Cum. Supp. 2008). NPGA is governed by a board of directors made up of a representative from each of the NPGA-member municipalities, including Falls City. Both MEAN and NPGA require their members to also be members of NMPP.
NMPP provides all the strategic planning and staffing services for NPGA and MEAN. Other than an executive director, who is employed jointly by NPGA and MEAN, neither organization has employees. NMPP's budgeting process is administered through a joint operating committee, which consists of representatives from NMPP, NPGA, and MEAN. At the beginning of each year, the amount of time each NMPP employee will devote to a particular organization is estimated and *331 expenses are then allocated among the organizations.
In 1995, NMPP, NPGA, and MEAN created APEA, another interlocal agency. APEA was intended to finance bonds through which natural gas was purchased. APEA remained separate from the joint operating committee and had its own staff, but sometimes utilized NMPP staff for various projects.
APEA issued bonds and purchased gas through a series of "prepays." A prepay involves the purchase of a large supply of natural gas to be delivered in the future. The goal is to purchase a large amount of natural gas at a lower price than index, or market, price. The bonds used to pay for the gas are tax exempt as long as municipal entities purchase the gas later. As the gas is delivered and paid for by the end user, the proceeds are used to repay the principal and interest on the bonds.
In addition to these entities, the individual defendants involved all work with or are involved with NMPP, NPGA, or APEA in some capacity. Stauffer joined NMPP as deputy executive director in 2003, then became executive director of NPGA and MEAN in April 2005. The executive director is an employee of NPGA and MEAN and has a joint employment contract with NMPP, NPGA, and MEAN. Harms is employed by NMPP, and his role is in purchasing and delivering natural gas to communities; Harms is also the chief operating officer of NPGA. Harms' salary expense is totally allocated to NPGA. Ward began employment with APEA as a consultant, then as executive vice president. Ward's role was in bond financing. He became the director of capital strategies of NMPP in 2003, and he served NPGA in the same capacity.
From the record, it is undisputed that there were personal conflicts between Roger Mock, president of APEA, and Stauffer, Harms, and Ward. There was also a controversy as to whether APEA should continue to run independently. In September 2004, the joint operating committee, NPGA, and MEAN's executive committee brought APEA under the direction of the executive director of NMPP. Three months later, those orders were rescinded and APEA resumed its independent operations.
It is also undisputed that in the summer of 2004, one of the contracted gas suppliers notified APEA, NMPP, and NPGA that it would be unable to deliver gas. Stauffer testified that the supplier's failure to deliver gas led to a need to restructure the revenue stream for NPGA. The supplier's failure to deliver ultimately led to a $50-million settlement with NPGA. NPGA still needed to find a reliable supply of gas for its participating municipalities, however.
NPGA did have other prepays, but the existing gas prepays were structured so that the amount of gas purchased increased over time. As the amount of gas purchased increased, so too did the amount of surplus gas that had to be resold, although up to the date of the trial, NPGA had always been able to sell the surplus gas. The sale of the extra gas allowed NPGA to cover its operating costs, and one of NPGA's biggest buyers for surplus gas was Metropolitan Utilities District (MUD).
When the board of directors for NPGA met in December 2004, the gas supplier's projects had been terminated and Harms recommended that the board restructure its gas portfolio. Harms also recommended that NPGA take the necessary time to explore all options, because NPGA had enough gas reserves to do so. In addition, Harms and Ward gave a presentation to the board about the alternatives to a prepay structure for obtaining natural *332 gas; this same presentation was later given to a number of entities that might be willing to partner with NPGA. The record is unclear as to whether Harms included information about CPEP at all the presentations.
In February 2005, Mock, president of APEA, presented a potential prepay to the NPGA board. The prepay spanned 10 years, and Mock believed that gas could be purchased at 10 cents below index. Mock also believed that the terms of that agreement would mirror the terms of a 2003 agreement between NPGA and APEA. Harms and Ward recommended against accepting APEA's offer, informing the board that there were other, more competitive sources of gas. NPGA declined APEA's offer. A few months later, Harms held a workshop for the NPGA directors, wherein he argued that a 20-year prepay had price advantages over a 10-year prepay. Harms also suggested that a prepay structure which allowed NPGA to purchase only the gas its members required would be more efficient and that NPGA was currently required to buy more gas than it could use under the terms of the APEA deal. After that workshop, Mock again proposed the 10-year prepay, which the board again rejected.
At the NPGA board meeting in May 2005, the NPGA considered proposals from APEA and the Goldman Sachs Group, Inc. Harms recommended against the APEA prepay once again, because he felt NPGA had more gas than it could use, but suggested accepting the offer from the Goldman Sachs Group if NPGA chose to do a prepay, because its discount was greater. A director of NPGA then moved to accept APEA's proposal, but the vote failed after legal counsel for NMPP stated that the proposed prepay might violate new Internal Revenue Service regulations.
Harms held a workshop for NPGA board members on April 24, 2006, stating in a memorandum to the members that he wanted to discuss CPEP and the value of becoming a member of CPEP. Whereas APEA bought large quantities of gas and then resold unused portions, CPEP's goals were to purchase just the amount required by the participants of the project at the lowest possible price. At the workshop, Harms recommended that NPGA consider membership in CPEP, because it could benefit from being a buyer, particularly if it partnered with MUD. As a partner with MUD, NPGA would benefit from MUD's large volume purchases to get a better rate. Harms presented two options: administer the program and/or buy gas as a member. The board took no formal action at that time.
The Falls City City Council authorized Falls City to bring suit against the individual defendants, NMPP, and CPEP shortly after the April 24, 2006, meeting. Falls City did not disclose its decision to sue at that time, and Falls City's representative continued to attend board meetings of NPGA. Falls City later filed suit on October 27, 2006.
Meanwhile, the option of joining CPEP was again brought to NPGA's attention at a meeting in July 2006, but no formal action was taken. At that meeting, the NPGA board spent much of its time discussing withdrawing from APEA. A month later, Harms informed the NPGA board of directors that MUD and the Cedar Falls, Iowa, utility district, as members of CPEP, were planning to do a 20-year prepay transaction. No formal action was taken by the NPGA board at that time. MUD and Cedar Falls later completed the prepay transaction at a highly competitive price. The NPGA and MEAN boards of directors decided to withdraw from APEA in August 2006.
*333 NPGA completed its withdrawal from APEA on February 26, 2007. NPGA, MEAN, and APEA entered into a written agreement governing NPGA and MEAN's withdrawal, as well as the disposition of the entities' equity in APEA. APEA was allowed to retain approximately $3.5 million in equity. APEA was also allowed to keep the prior claim it had filed against Stauffer and Ward, but was required to pay NPGA and MEAN 85 percent of any recovery. NPGA released NMPP and its individual officers from all claims, however.
In its complaint, Falls City claimed that NMPP had breached its contract with NPGA and its individual members. Falls City alleged that Stauffer, Harms, and Ward, along with others, violated their fiduciary duties to NPGA by investigating the possibility of forming a new entity, CPEP. Falls City claimed that the formation of CPEP violated the individual defendants' responsibilities to the individual members of NPGA, including Falls City. Falls City further alleged that the individual defendants took APEA's proprietary prepay information and utilized it in CPEP's business plan, that they conspired to deprive APEA and NPGA of business opportunities, and that the conspiracy resulted in damages to Falls City. Falls City cited the possible prepay presented to the NPGA board in February 2005 by Mock as the lost business opportunity.
NMPP argues that the NPGA board was aware of its investigation into alternatives to natural gas prepays and that the investigation was authorized. NMPP and the individual defendants insisted that the boards had been informed of the possibility of creating CPEP and that rejecting the APEA prepay was a business decision. NMPP and the individual defendants claimed that Falls City did not have standing to sue in its own right as a member of NPGA, or on behalf of NPGA, and that the Interlocal Cooperation Act did not grant Falls City the right to sue. The individual defendants argued they were protected by the Political Subdivisions Tort Claims Act as employees of a political subdivision and that the release signed between NPGA and APEA applied to them and to NMPP.
After a bench trial, the district court dismissed two of the individual defendants. The district court also found that Falls City had failed to prove the breach of contract claim against NMPP and dismissed that claim. The district court entered judgment in favor of Falls City and against Stauffer, Harms, and Ward on its claim of breach of fiduciary duty and its claim of conspiracy. Falls City received a damage award for $628,267.90, and the district court entered an injunction against Stauffer, Harms, and Ward precluding them from participating in any of CPEP's prepaid gas activities. The district court also required NMPP to disgorge payments from CPEP for the performance of services for CPEP.

ASSIGNMENTS OF ERROR
NMPP assigns, consolidated and restated, that the district court erred in (1) finding that Falls City had legal standing to sue, (2) finding that the individual defendants were not exempt under the Political Subdivisions Tort Claims Act, (3) finding that the legal release signed by NPGA did not release NMPP and the individual defendants, (4) finding that there was a conspiracy among the individual defendants and NMPP to breach their fiduciary duty, (5) finding that NPGA and Falls City were damaged by NMPP's actions, and (6) exceeding the scope of its authority by entering an injunction against NMPP and the individual defendants.
*334 The individual defendants assign in their cross-appeal, consolidated and restated, that the district court erred in (1) finding that a member of an interlocal agency has the right to sue on behalf of the interlocal agency and (2) awarding damages to Falls City.
CPEP assigns in its cross-appeal that the district court erred in declining to hold that the February 26, 2007, withdrawal agreement effectively barred the claims asserted by Falls City.
In its cross-appeal, Falls City assigns that the district court erred in (1) finding that sovereign immunity bars its action against CPEP, (2) finding that Falls City did not adequately prove its contract claim against NMPP, (3) finding that Falls City cannot bring a derivative claim on behalf of NPGA, and (4) limiting Falls City's damages to a 5-year period of time.

STANDARD OF REVIEW
In an appeal of an equity action, an appellate court tries factual questions de novo on the record and reaches a conclusion independent of the findings of the trial court, provided that where credible evidence is in conflict on a material issue of fact, the appellate court considers and gives weight to the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another.[1]
Statutory interpretation is a matter of law in connection with which an appellate court has an obligation to reach an independent, correct conclusion irrespective of the determination made by the trial court.[2]

ANALYSIS
The determinative issue in this case is whether Falls City has standing to bring this suit in its own behalf and on behalf of NPGA. In its order, the district court stated that "Falls City cannot bring an action on behalf of other members of NPGA" but that Falls City could "acquir[e] for its own benefit remedies for breaches of duties owed to NPGA." The district court stated that "each member of NPGA is a separate political subdivision of the State of Nebraska and there ha[d] not been a lawful delegation to Falls City to act on behalf of the other members." Therefore, Falls City could not bring suit on behalf of the others. The district court determined that "the purpose of the [interlocal] agreement is to permit Falls City to exercise its power and authority." The district court also stated that "the relationships established by interlocal agreements are not delegations of authority and power by the individual member, but a cooperative and joint exercise of powers possessed by the individual members." While we agree that an interlocal agreement creates the opportunity for a cooperative and joint exercise of powers, it also necessarily involves a delegation of authority.
The purpose of the Interlocal Cooperation Act is "to permit local governmental units to make the most efficient use of their taxing authority and other powers by enabling them to cooperate with other localities on a basis of mutual advantage and thereby to provide services and facilities."[3] Under § 13-804(2), any two or more public agencies may enter into agreements with one another for joint or cooperative action under the Interlocal Cooperation Act. An *335 interlocal agreement must specify its duration, general organization, and purpose, among other things.[4]
In the event that an agreement made pursuant to this section creates a joint entity, such joint entity shall be subject to control by its members in accordance with the terms of the agreement; shall constitute a separate public body corporate and politic of this state, exercising public powers and acting on behalf of the public agencies which are parties to such agreement; and shall have power (a) to sue and be sued, (b) to have a seal and alter the same at pleasure or to dispense with its necessity, (c) to make and execute contracts and other instruments necessary or convenient to the exercise of its powers, and (d) from time to time, to make, amend, and repeal bylaws, rules, and regulations . . . .[5]
The district court's decision in this case rests on the assumption that Falls City could not enter into a contract that would prevent Falls City from later suing to protect its own interests or to exercise its powers. However, the Interlocal Cooperation Act allows a political subdivision to enter into a contract to form an interlocal agency that will act on its behalf. And an interlocal agency, as a creature of statute, is bound by the statute creating it and has only the rights and remedies granted to it under the statute.[6]
Under § 13-804(6), a joint entity created under the Interlocal Cooperation Act is subject to the control of its members in accordance with the agreement. The question then becomes whether Falls City is allowed to bring suit as a member of an interlocal agency under the agreement Falls City signed. Under the bylaws of NPGA, the business and affairs of NPGA are to be managed by the board of directors. As a charter member, Falls City had a representative on the board of directors and the right to cast a vote. The bylaws authorize the executive director to enter into any contracts or instruments to which he or she is authorized by the board of directors. If NPGA is dissolved, the assets are to be converted to cash and distributed to members in good standing. As a charter member, Falls City is to receive 18.762 percent of the equity balance should NPGA be dissolved.
The interlocal agreement, as signed by Falls City, recites that "[t]he Participants desire to study and evaluate on a continuing basis the benefits that may result to the Participants and their residents from the coordination of gas resources and facilities"; "to enter into an interlocal agreement pursuant to which the Participants, among other objectives, will cooperate mutually to assure an economical supply of firm or interruptible gas to meet their respective local requirements"; and "to create a joint entity to exercise public powers and to act on the behalf of the Participants for the purposes set forth in such interlocal agreement." One of the purposes of the NPGA was to "attain maximum practicable economy to the Participants." The interlocal agreement also lists the privileges and powers granted to an interlocal agency under the Interlocal Cooperation Act, such as the power to sue and be sued, to have a seal and alter the same, to make and execute contracts and other instruments, and to make and amend its bylaws.
No case law exists as to whether a member of an interlocal agency may bring a suit under these circumstances, but as *336 previously noted, an interlocal agency is a creature of statute.[7] The interlocal statutes do not speak directly to this issue, but the plain language of the statute allows a public entity to join an interlocal agency in order to provide services and/or meet obligations.[8] The interlocal agreement signed by Falls City gave NPGA the power to sue and be sued but says nothing about the ability of its members to sue on behalf of NPGA, or in its own behalf. In fact, the interlocal agreement gives power and authority to make such decisions to the board of directors, which included a representative from Falls City. Under the interlocal agreement, Falls City had one vote on the board and the option to withdraw from NPGA if it was unhappy with the decisions that were made. The record demonstrates that the board of directors made a policy decision when it chose to turn down the offered prepay and explore other alternatives. Nothing in the interlocal agreement would allow a participant to sue on behalf of NPGA.
In addition, we note that Falls City is essentially asking that NPGA be treated as a private corporation when it is an interlocal agency and is more akin to a quasi-municipal corporation. Nebraska has recognized various limited-purpose entities as quasi-municipal corporations, such as building commissions,[9] sanitary and improvement districts,[10] school districts,[11] and reclamation districts.[12] Quasi-municipal corporations are public entities, and public entities serve the public good, as do public officials.[13] In order to have standing, a litigant must assert the litigant's own legal rights and interests and cannot rest his or her claim on the legal rights or interests of third parties,[14] in this case, NPGA.
We note that the character of an interlocal agency such as NPGA, like that of a quasi-municipal corporation, "is twofoldin the exercise of its governmental functions, as a subdivision of the government, and as a private corporation, enjoying powers and privileges conferred for its own benefit."[15] A distinguishing feature of a municipal or quasi-municipal corporation, or interlocal agency, is that "it is not only a body corporate but also a body politic, the components of which, the corporators, are endowed with the right to exercise in their collective capacity a portion of the political power of the state."[16] *337 As such, profit-seeking entities operate under different principles than does a municipal or quasi-municipal corporation or interlocal agency, which may act for a broader political purpose, seemingly in disregard of the best fiscal interests of the entity. Interlocal agencies entrusted with a duty to the public at large are not judged under the same principles governing private, for-profit corporations. And when a decision has been entrusted to the discretion of a public officer or board, that decision will not ordinarily be reviewed by the courts.[17]
In its brief, Falls City asks that we apply corporate law, even while asserting that NPGA is not a corporation. Essentially, Falls City has asked to be treated as though it is a shareholder bringing a derivative lawsuit. As a member of an interlocal agency, however, Falls City delegated the power and responsibility of providing natural gas to its citizens to NPGA. In this case, Falls City does not have standing to sue because neither NMPP nor the individual defendants owed it any fiduciary duties.
We find that neither the Interlocal Cooperation Act nor the agreement Falls City signed when it joined NPGA granted Falls City the right to bring suit against NMPP or the individual defendants. NPGA is a public body, and its duties are owed to the public. Therefore, Falls City did not have standing to bring this cause of action and the action must be dismissed. Because Falls City did not have standing to bring this claim, we need not address the other assignments of error or the cross-appeals filed by either the individual defendants or CPEP.

CONCLUSION
As an interlocal agency, NPGA is a creature of statute, and Falls City is a member of the interlocal agency. Falls City signed the interlocal agreement giving the board of directors of NPGA power to make business decisions on its behalf. Neither the Interlocal Cooperation Act nor the agreement gives Falls City standing to sue NMPP or the individual defendants. We therefore find that Falls City had no right to bring this cause of action, and we reverse, and remand to the district court with directions to dismiss.
REVERSED AND REMANDED WITH DIRECTIONS.
WRIGHT and MILLER-LERMAN, JJ., not participating.
NOTES
[1] ProData Computer Servs. v. Ponec, 256 Neb. 228, 590 N.W.2d 176 (1999).
[2] Japp v. Papio-Missouri River NRD, 271 Neb. 968, 716 N.W.2d 707 (2006).
[3] § 13-802.
[4] § 13-804(3).
[5] § 13-804(6).
[6] See Kosmicki v. State, 264 Neb. 887, 652 N.W.2d 883 (2002).
[7] See, e.g., Jacobson v. Solid Waste Agency of Northwest Neb., 264 Neb. 961, 653 N.W.2d 482 (2002); Kosmicki v. State, supra note 6.
[8] See Roggasch v. Region IV Ofc. of Developmental Dis., 228 Neb. 636, 423 N.W.2d 771 (1988).
[9] Dwyer v. Omaha-Douglas Public Building Commission, 188 Neb. 30, 195 N.W.2d 236 (1972).
[10] Rexroad, Inc. v. S.I.D. No. 66, 222 Neb. 618, 386 N.W.2d 433 (1986).
[11] School Dist. No. 8 v. School Dist. No. 15, 183 Neb. 797, 164 N.W.2d 438 (1969).
[12] Nebraska Mid-State Reclamation District v. Hall County, 152 Neb. 410, 41 N.W.2d 397 (1950).
[13] See State ex rel. NSBA v. Douglas, 227 Neb. 1, 416 N.W.2d 515 (1987).
[14] In re Petition of SID No. 1, 270 Neb. 856, 708 N.W.2d 809 (2006).
[15] 1 William Meade Fletcher, Fletcher Cyclopedia of the Law of Corporations § 60 at 389 (perm. ed., rev. vol. 2006).
[16] 1 Eugene McQuillin, The Law of Municipal Corporations § 2.07.10 at 145 (John H. Silvestri & Mark S. Nelson eds., rev. 3d ed. 1999). See, also, Kennelly v. Kent County Water Authority, 79 R.I. 376, 89 A.2d 188 (1952); Matthews v. Wenatchee Heights Water, 92 Wash.App. 541, 963 P.2d 958 (1998).
[17] See, Mtr. of Duallo Realty v. Silver, 32 Misc.2d 539, 224 N.Y.S.2d 55 (1962); Jones v. Nash County General Hospital, 1 N.C.App. 33, 159 S.E.2d 252 (1968).