Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
06/07/2019 09:08 AM CDT

- 509 -

Nebraska Supreme Court Advance Sheets
302 Nebraska Reports
MEYER NATURAL FOODS v. GREATER OMAHA PACKING CO.
Cite as 302 Neb. 509

Meyer Natural Foods LLC and Crum & Forster
Specialty Insurance Company, appellants, v.
Greater Omaha Packing Co., Inc., appellee.

___ N.W.2d ___

Filed March 15, 2019.    No. S-18-108.

1. **Summary Judgment.** Summary judgment is proper when the pleadings and the evidence admitted at the hearing disclose that there is no genuine issue as to any material fact or as to the ultimate inferences that may be drawn from those facts and that the moving party is entitled to judgment as a matter of law.

2. **Summary Judgment: Appeal and Error.** An appellate court will affirm a lower court's grant of summary judgment if the pleadings and admitted evidence show that there is no genuine issue as to any material facts or as to the ultimate inferences that may be drawn from those facts and that the moving party is entitled to judgment as a matter of law.

3. ____: ____. In reviewing a summary judgment, the court views the evidence in the light most favorable to the party against whom the judgment was granted and gives such party the benefit of all reasonable inferences deducible from the evidence.

4. **Contracts: Judgments: Appeal and Error.** The meaning of a contract is a question of law, in connection with which an appellate court has an obligation to reach its conclusions independently of the determinations made by the court below.

5. **Contracts.** A contract written in clear and unambiguous language is not subject to interpretation or construction and must be enforced according to its terms.

6. **Contracts: Words and Phrases.** A contract is ambiguous when a word, phrase, or provision in the contract has, or is susceptible of, at least two reasonable but conflicting interpretations or meanings.

7. **Contracts.** A determination as to whether an ambiguity exists in a contract is to be made on an objective basis, not by the subjective contentions of the parties; thus, the fact that the parties have suggested

- 510 -

Nebraska Supreme Court Advance Sheets
302 Nebraska Reports
MEYER NATURAL FOODS v. GREATER OMAHA PACKING CO.
Cite as 302 Neb. 509

opposite meanings of a disputed instrument does not necessarily compel the conclusion that the instrument is ambiguous.

8. **Contracts: Appeal and Error.** An appellate court will not rewrite a contract to provide terms contrary to those which are expressed. Nor is it the province of a court to rewrite a contact to reflect the court's view of a fair bargain.

9. **Contracts.** The parties to a contract must be held to the plain language of the agreement they entered into.

10. **Uniform Commercial Code: Contracts: Intent.** The question of whether it is a contract for the sale of goods depends upon an examination of the entire contract. The Uniform Commercial Code applies where the principal purpose of the contract is the sale of goods, even though in order for the goods to be utilized, some installation is required. On the other hand, if the contract is principally for services and the goods are merely incidental to the contract, the provisions of the Uniform Commercial Code do not apply.

11. ____: ____: ____. The test for inclusion in or exclusion from the sales provisions of Neb. U.C.C. art. 2 (Reissue 2001) is not whether the contracts are mixed but, granting that they are mixed, whether their predominant factor, their thrust, their purpose, reasonably stated, is the rendition of service, with goods incidentally involved, or whether they are transactions of sale, with labor incidentally involved.

12. **Damages.** Damages are not recoverable for loss that the injured party could have avoided without undue risk, burden, or humiliation.

Appeal from the District Court for Douglas County: Shelly R. Stratman, Judge. Affirmed.

Thomas A. Grennan and Adam J. Wachal, of Gross & Welch, P.C., L.L.O., for appellants.

Michael F. Coyle and Jordan W. Adam, of Fraser Stryker, P.C., L.L.O., for appellee.

Heavican, C.J., Miller-Lerman, Cassel, Stacy, Funke, Papik, and Freudenberg, JJ.

Heavican, C.J.

## INTRODUCTION

Meyer Natural Foods LLC (Meyer), together with Crum & Forster Specialty Insurance Company, sued Greater Omaha Packing Company, Inc. (GOP), for breach of contract following

a purported *E. coli* "O157:H7" contamination of beef owned by Meyer and processed by GOP. The district court for Douglas County granted summary judgment in favor of GOP. Although our reasoning differs from that of the district court, we affirm.

## BACKGROUND

On April 27, 2006, Meyer and GOP entered into a processing agreement, which was amended on May 17, whereby GOP would slaughter Meyer's cattle, process the beef, and fabricate the same into various beef products. GOP engaged in the processing of Meyer beef 1 day per week for 5 years, until May 2011.

Processing of beef by GOP generally entails that after cattle are "harvested," the carcasses are chilled for 24 hours. Once chilled, the beef is "fabricated," a practice in which workers process the chilled carcasses into larger cuts of beef known as intact cuts (e.g., tenderloins, rib eyes, briskets) and into smaller pieces of beef known as nonintact cuts or trim (used to make products such as ground beef). Intact cuts are shrink wrapped and shipped in boxes, referred to as "boxed beef." The nonintact beef, or trim, is placed into large cardboard "combo bins" containing approximately 2,000 pounds of a combination of raw beef trim. The trim is then shipped to processing facilities across the United States for the purpose of making ground beef. When making ground beef, trim is mixed and ground with other nonintact beef products. This requires that the large cardboard combo bins of beef trim be tested for the presence of *E. coli* prior to the production of ground beef.

On April 25, 2011, Meyer delivered 1,600 head of cattle to GOP for slaughter, processing, and fabrication pursuant to the agreement. On April 27, GOP slaughtered the cattle delivered by Meyer. Also pursuant to the agreement, in the days following the slaughter and rendering, GOP tested the beef for the presence of various strains of *E. coli*.

The Meyer beef that had been fabricated by GOP on April 27, 2011, was then sealed and delivered to Meyer's offices

- 512 -

NEBRASKA SUPREME COURT ADVANCE SHEETS
302 NEBRASKA REPORTS
MEYER NATURAL FOODS v. GREATER OMAHA PACKING CO.
Cite as 302 Neb. 509

in Omaha, Nebraska, under a "hold," per GOP's standard procedure known as the Hazard Analysis and Critical Control Point plan, which is approved by the U.S. Department of Agriculture.

Under the plan, the combo bins are tested and then sealed. Once sealed, the combo bins may be placed on refrigerated trailers and shipped, but cannot be opened until the results of the *E. coli* testing are returned. Any combo bins containing trim testing presumptively positive for the presence of impermissible pathogens are diverted to "cookers" for a lethality treatment, which is industry standard.

In this case, an independent laboratory found that of the 211 samples tested, 37 resulted in a presumptive positive finding of the presence of *E. coli* O157:H7. The 37 presumptive positive samples constituted a 17½-percent finding of *E. coli* contamination. This percentage was over three times the number of presumptive positives necessary to trigger an "event day," in which there is a very high percentage of presumptive positive findings for *E. coli*.

On April 28, 2011, GOP met with Meyer and informed them of the presumptive positive test results for the presence of *E. coli*. Meyer immediately recalled the trucks. The beef that had tested presumptively positive for *E. coli* O157:H7 was either sent to a cooker so that the product could ultimately be sold at a reduced charge or transported to a landfill because it was altogether unsafe for human consumption.

Meyer filed suit against GOP. As set forth in its second amended complaint, Meyer alleged breach of contract, breach of warranty, breach of an indemnity obligation, failure to obtain insurance, and breach of the guarantee. Meyer filed an amended motion for partial summary judgment, requesting the court to find that GOP failed to obtain and maintain "'property insurance'" on the value of Meyer's property. Prior to the district court's ruling on Meyer's motion, GOP filed its own motion for summary judgment.

The district court concluded the evidence was clear that GOP had a property insurance policy with Liberty Mutual Fire

- 513 -

Nebraska Supreme Court Advance Sheets
302 Nebraska Reports
MEYER NATURAL FOODS v. GREATER OMAHA PACKING CO.
Cite as 302 Neb. 509

Insurance Company, which policy remained in full force and effect for the duration of the agreement. The court found that the policy provided insurance coverage for any nonowned personal property in GOP's care, custody, and control that GOP "'agreed, prior to loss, to insure.'" The court further found that the policy's liability limit was $98,836,333 per occurrence, complying with the terms of the addendum to section 18. The court noted that the addendum to section 18, which replaced the original language in section 18 of the processing agreement, required only that GOP "maintain property insurance on Meyer Natural Angus property in its possession, with a total value of $1,800,000," with which GOP complied. The court interpreted the agreement and addendum as not requiring GOP to carry property insurance coverage for an *E. coli* O157:H7 contamination. Therefore, the court held that Meyer's contention that GOP failed to obtain insurance as required by the contract failed as a matter of law.

The court then found that Meyer's claims against GOP with regard to breach of contract, breach of warranty, breach of indemnity obligation, and breach of guarantee failed as a matter of law due to Meyer's failure to return the rejected processed meat to GOP, which the court found was the remedy provided under the agreement for products failing to meet a specification or warranty provided by GOP. The court subsequently granted GOP's renewed amended motion for summary judgment and denied Meyer's amended motion for summary judgment.

## ASSIGNMENTS OF ERROR

Meyer alleges 11 assignments of error, which can be condensed and restated as 4: The trial court erred in (1) finding that GOP carried property insurance in accordance with the agreement and overruling Meyer's motion for partial summary judgment; (2) finding that the agreement did not require GOP to carry property insurance for *E. coli* contamination and, as such, granting GOP's motion for summary judgment; (3) incorrectly interpreting section 10 of the agreement to conclude that

- 514 -

Nebraska Supreme Court Advance Sheets
302 Nebraska Reports
MEYER NATURAL FOODS v. GREATER OMAHA PACKING CO.
Cite as 302 Neb. 509

Meyer had accepted the *E. coli* contaminated beef under the agreement or under the Uniform Commercial Code; and (4) finding that GOP was not negligent and therefore not liable for indemnity under the agreement.

## STANDARD OF REVIEW

[1,2] Summary judgment is proper when the pleadings and the evidence admitted at the hearing disclose that there is no genuine issue as to any material fact or as to the ultimate inferences that may be drawn from those facts and that the moving party is entitled to judgment as a matter of law.[1] An appellate court will affirm a lower court's grant of summary judgment if the pleadings and admitted evidence show that there is no genuine issue as to any material facts or as to the ultimate inferences that may be drawn from those facts and that the moving party is entitled to judgment as a matter of law.[2]

[3] In reviewing a summary judgment, the court views the evidence in the light most favorable to the party against whom the judgment was granted and gives such party the benefit of all reasonable inferences deducible from the evidence.[3]

[4] The meaning of a contract is a question of law, in connection with which an appellate court has an obligation to reach its conclusions independently of the determinations made by the court below.[4]

## ANALYSIS

*GOP's Property Insurance*
*Pursuant to Agreement.*

Meyer assigns that the trial court erred in finding that GOP carried property insurance in accordance with the agreement and, accordingly, overruling Meyer's motion for partial summary judgment. The crux of Meyer's argument is that the

---

[1] *Continental Cas. Co. v. Calinger*, 265 Neb. 557, 657 N.W.2d 925 (2003).

[2] *Edwards v. Hy-Vee*, 294 Neb. 237, 883 N.W.2d 40 (2016).

[3] *Zornes v. Zornes*, 292 Neb. 271, 872 N.W.2d 571 (2015).

[4] *McKinnis Roofing v. Hicks*, 282 Neb. 34, 803 N.W.2d 414 (2011).

- 515 -

NEBRASKA SUPREME COURT ADVANCE SHEETS
302 NEBRASKA REPORTS
MEYER NATURAL FOODS v. GREATER OMAHA PACKING CO.
Cite as 302 Neb. 509

insurance policy's exclusion of coverage for damage resulting from *E. coli* constituted a breach of section 18 of the agreement, which required GOP to "maintain property insurance on Meyer Natural Angus Property in its possession, with a total value of $1,800,000." Incorporated into Meyer's claim that GOP failed to carry insurance in accordance with the terms of the agreement is Meyer's claim that the agreement did not permit the exclusion of *E. coli* insurance in GOP's insurance policy.

[5-9] A contract written in clear and unambiguous language is not subject to interpretation or construction and must be enforced according to its terms.[5] A contract is ambiguous when a word, phrase, or provision in the contract has, or is susceptible of, at least two reasonable but conflicting interpretations or meanings.[6] A determination as to whether an ambiguity exists in a contract is to be made on an objective basis, not by the subjective contentions of the parties; thus, the fact that the parties have suggested opposite meanings of a disputed instrument does not necessarily compel the conclusion that the instrument is ambiguous.[7] Further, we will not rewrite the contract to provide terms contrary to those which are expressed. Nor is it the province of a court to rewrite a contact to reflect the court's view of a fair bargain.[8] The parties to a contract must be held to the plain language of the agreement they entered into.[9]

Turning to the record, we note that GOP and Meyer first entered into an agreement that contained a provision requiring GOP to maintain comprehensive property insurance. We need

---

[5] *Gary's Implement v. Bridgeport Tractor Parts*, 270 Neb. 286, 702 N.W.2d 355 (2005).

[6] *Kluver v. Deaver*, 271 Neb. 595, 714 N.W.2d 1 (2006).

[7] *Sack Bros. v. Tri-Valley Co-op*, 260 Neb. 312, 616 N.W.2d 786 (2000).

[8] See *Wurst v. Blue River Bank*, 235 Neb. 197, 454 N.W.2d 665 (1990).

[9] See *Berens & Tate v. Iron Mt. Info. Mgmt.*, 275 Neb. 425, 747 N.W.2d 383 (2008).

- 516 -

Nebraska Supreme Court Advance Sheets
302 Nebraska Reports
MEYER NATURAL FOODS v. GREATER OMAHA PACKING CO.
Cite as 302 Neb. 509

not pass on the extent to which the original insurance provision would have covered an *E. coli* contamination, because the original language of the provision entered into on April 27, 2006, was replaced by the addendum entitled "Letter of Understanding - Revisions," which was executed on or about May 17. Despite the typographical error with regard to the date the original agreement was signed, it is clear that the addendum was to replace the language of the original section 18 contained in the agreement. This conclusion is evidenced by the language of the addendum, just below "Section 18 — INSURANCE," which states "[t]he following verbiage will replace the signed Processing Agreement language . . . ."

Under section 18 of the agreement, as amended by the addendum dated May 17, 2006, Meyer and GOP agreed that "[t]he following verbiage will replace the signed Processing Agreement language: [GOP] shall, during term of agreement, maintain property insurance on Meyer Natural Angus property in its possession, with a total value of $1,800,000. Additionally, [GOP] agrees to provide coverage as evidenced in the Certificate of Insurance."

According to the language of the addendum, GOP was required to maintain property insurance only on Meyer's property in GOP's possession. The language of the addendum is void of any requirements regarding the inclusion of *E. coli* coverage or the prohibition of exclusions contained within the insurance policy. Section 18, as contemplated in the addendum, further specifies that the coverage to be provided would be "evidenced in the Certificate of Insurance." The certificate of insurance is void of any language guaranteeing coverage for loss caused by *E. coli* contamination. Additionally, nothing in the addendum required GOP to carry property insurance for coverage for an *E. coli* O157:H7 contamination. As we have previously stated, it is not the province of the court to rewrite a contract to reflect the court's view of a fair bargain.[10]

---

[10] *Wurst v. Blue River Bank, supra* note 8.

- 517 -

NEBRASKA SUPREME COURT ADVANCE SHEETS
302 NEBRASKA REPORTS
MEYER NATURAL FOODS v. GREATER OMAHA PACKING CO.
Cite as 302 Neb. 509

As the district court correctly noted, the evidence is clear that GOP had a property insurance policy with Liberty Mutual Fire Insurance Company, which remained in full force and effect for the duration of the agreement. The policy provided insurance coverage for any nonowned personal property in GOP's care, custody, and control that GOP "'agreed, prior to loss, to insure.'" The language of the addendum is clear and unambiguous, requiring only that GOP "maintain property insurance on Meyer Natural Angus property in its possession, with a total value of $1,800,000." The record is clear that GOP maintained property insurance in accordance with the addendum to the agreement.

Meyer's assignment of error with regard to whether GOP carried property insurance in accordance with the agreement, and accordingly, Meyer's argument that the court erred in denying its motion for partial summary judgment, is without merit.

Meyer's assignment of error in regard to the insurance policy, as well as the agreement requiring coverage for *E. coli* contamination, is without merit.

*Section 10 of Agreement as It Pertains to Meyer's*
*Alleged Acceptance and Implications of*
*Uniform Commercial Code.*

Next, Meyer assigns that the court erred in granting GOP's motion for summary judgment, finding that Meyer had accepted the *E. coli* contaminated beef according to section 10 of the agreement, and that GOP was not liable to Meyer under the agreement.

Meyer argues that it did not accept the meat under the terms of the agreement or the Uniform Commercial Code, because it notified GOP of its nonconforming product within days of delivery. Meyer argues alternatively that if it is found to have accepted the meat, GOP is nevertheless responsible for any breach of express warranties. Specifically, Meyer contends that GOP breached the guarantee and agreement when it delivered possession of *E. coli* contaminated beef to Meyer, because the

- 518 -

Nebraska Supreme Court Advance Sheets
302 Nebraska Reports
MEYER NATURAL FOODS v. GREATER OMAHA PACKING CO.
Cite as 302 Neb. 509

beef was adulterated under federal and state law. Meyer argues that GOP expressly warranted that the meat it processed would not be adulterated under any applicable law.

We turn first to the contractual argument concerning the alleged acceptance. Meyer argues that it did not accept the beef processed by GOP, because the meat was adulterated and thus a nonconforming good, to which they alerted GOP within days of the delivery.

The district court found that pursuant to Neb. U.C.C. § 2-707(2) (Reissue 2001), Meyer had knowingly accepted the contaminated meat and "had it sent to either a cooker so that the product could ultimately be sold at a reduced charge or was transported to a landfill, since it was altogether unsafe for human consumption." The court further found that Meyer failed to avail itself of its rights under the agreement and that its claims failed as a matter of law.

[10] The district court improperly applied article 2 of the Uniform Commercial Code when it relied on Neb. U.C.C. § 2-607(2) (Reissue 2001). In *Mennonite Deaconess Home & Hosp. v. Gates Eng'g Co.*,[11] this court discussed the applicability of the Uniform Commercial Code when a contract calls for both the sale of goods and the rendition of services, noting:

> The question of whether this is a contract for the sale of goods depends upon an examination of the entire contract. The cases are uniform in holding that the [Uniform Commercial Code] applies where the principal purpose of the contract is the sale of goods, even though in order for the goods to be utilized, some installation is required. On the other hand, if the contract is principally for services and the goods are merely incidental to the contract, the provisions of the [Uniform Commercial Code] do not apply.

[11] The test for inclusion in or exclusion from the sales provisions of Neb. U.C.C. art. 2 (Reissue 2001) is not whether

---

[11] *Mennonite Deaconess Home & Hosp. v. Gates Eng'g Co.*, 219 Neb. 303, 307-08, 363 N.W.2d 155, 160 (1985).

- 519 -

Nebraska Supreme Court Advance Sheets
302 Nebraska Reports
MEYER NATURAL FOODS v. GREATER OMAHA PACKING CO.
Cite as 302 Neb. 509

the contracts are mixed but, granting that they are mixed, whether their predominant factor, their thrust, their purpose, reasonably stated, is the rendition of service, with goods incidentally involved, or whether they are transactions of sale, with labor incidentally involved.[12]

Here, the contract spanned several years with the predominant factor's being GOP's fabrication of beef supplied by Meyer. It is significant that ownership of the cattle never left Meyer's control and that it does not appear from the record that GOP engaged in any exchange of beef products between Meyer and other GOP clients. Thus, the contract involved in this case was for that of services and only incidentally involved goods.

Still, we find no error in the district court's ultimate conclusion. Under section 10 of the agreement, Meyer had the option to reject "[a]ll products failing to meet the warranties and specifications contained in this Agreement . . . ." Section 10 provides that rejected products be "returned or held at GOP's expense and risk." That section further indicates that "Meyer shall charge GOP its out-of-pocket expenses of storing and reshipping any products *properly rejected* by Meyer under this Agreement." (Emphasis supplied.)

As the district court noted, some of the contaminated products were sent to cookers where the products were to be treated in accordance with industry standards to eradicate *E. coli* contamination. While the parties contended at oral argument that some of the contaminated products were returned to GOP, the record does not demonstrate that any of the contaminated products were returned. Specifically, under the heading "5-03-11-Tuesday," exhibit 101 states, "[GOP] discussed re-working the product on Saturday. . . . The Meyer Natural Angus decision was to send the entire product produced within the event time period to a cooker." The record demonstrates that the products were diverted to cookers, landfills, or simply

---

[12] *Id.*

- 520 -

Nebraska Supreme Court Advance Sheets
302 Nebraska Reports
MEYER NATURAL FOODS v. GREATER OMAHA PACKING CO.
Cite as 302 Neb. 509

left unreturned. Under the terms of the agreement, Meyer had the responsibility of returning to GOP any rejected product. In this case, Meyer acted unilaterally in disposing of the contaminated beef and therefore failed to adhere to the terms specified to properly reject products under the agreement.

[12] According to the Restatement (Second) of Contracts, "damages are not recoverable for loss that the injured party could have avoided without undue risk, burden or humiliation."[13] Here, Meyer could have avoided the loss caused by GOP's breach had Meyer simply returned or held the rejected product at GOP's expense according to section 10 of the agreement. The record demonstrates that GOP sought to "rework" the product in order to cure the breach, which Meyer rejected. Meyer failed to avoid the damages, and is not entitled to recover for damages that could have been avoided. Therefore, although the district court's reasoning was flawed in its application of the Uniform Commercial Code, it was correct in its ultimate conclusion with regard to the products left unreturned.

*Express Warranty.*

We turn now to Meyer's contention that GOP breached its express warranty that the meat it processed would "not be adulterated or misbranded within the meaning of *any* applicable federal, state, or local law, or any rules and regulations promulgated thereunder[.]" (Emphasis supplied.) As the meaning of the word "adulterated" is not ambiguous under the terms of section 15(a)(iv)(A), the issue turns on statutory interpretation. Meyer argues that under the Federal Meat Inspection Act (FMIA),[14] and Nebraska law, the meat delivered by GOP was adulterated, in breach of GOP's express warranty.[15]

---

[13] Restatement (Second) of Contracts § 350(1) at 126 (1981).

[14] See 21 U.S.C. § 601 et seq. (2012 & Supp. V 2017).

[15] See Neb. Rev. Stat. § 81-2,282(2) (Reissue 2014). See, also, Neb. Rev. Stat. § 54-1902 (Reissue 2010).

- 521 -

Nebraska Supreme Court Advance Sheets
302 Nebraska Reports
MEYER NATURAL FOODS v. GREATER OMAHA PACKING CO.
Cite as 302 Neb. 509

Under the FMIA,

[t]he term "adulterated" shall apply to any carcass, part thereof, meat or meat food product under one or more of the following circumstances:

(1) if it bears or contains any poisonous or deleterious substance which may render it injurious to health; but in case the substance is not an added substance, such article shall not be considered adulterated under this clause if the quantity of such substance in or on such article does not ordinarily render it injurious to health;

(2)(A) if it bears or contains (by reason of administration of any substance to the live animal or otherwise) any added poisonous or added deleterious substance (other than one which is (i) a pesticide chemical in or on a raw agricultural commodity; (ii) a food additive; or (iii) a color additive) which may, in the judgment of the Secretary, make such article unfit for human food;

. . . .

(3) if it consists in whole or in part of any filthy, putrid, or decomposed substance or is for any other reason unsound, unhealthful, unwholesome, or otherwise unfit for human food[.][16]

In *Texas Food Industry Ass'n v. Espy*,[17] the U.S. District Court for the Western District of Texas, when commenting on the U.S. Department of Agriculture's program of sampling retail establishments for the presence of *E. coli*, stated that "[a]ny of these samples testing positive for the pathogen *E. Coli* would be treated as 'adulterated' under the [FMIA]." GOP argues that *Espy* is distinguishable, because in that case the samples tested positive, not merely presumptive positive as is the case here.

GOP further seeks to have this court hold that in order for the meat to be considered "adulterated" under the law, it must

---

[16] 21 U.S.C. § 601(m).

[17] *Texas Food Industry Ass'n v. Espy*, 870 F. Supp. 143, 145 (W.D. Tex. 1994).

enter into the stream of commerce. GOP argues that the central purpose of the FMIA is to prevent the adulteration of food and to prevent adulterated food from being introduced into, or received in, interstate commerce. Thus, GOP contends that in this case, the contaminated beef does not meet the definition of adulterated, because it was withheld from public distribution under GOP's standard procedure plan.

GOP's argument misconstrues the purpose of the inclusion of the term "commerce" in the law. As contemplated in the federal law, "commerce" refers to the constitutional grant of authority to Congress to enact laws under article I, § 8, of the Constitution of the United States. That is to say, that in promulgating the regulatory scheme, the FMIA was describing that

> [t]he commerce power is "the power to regulate; that is, to prescribe the rule by which commerce is to be governed. This power, like all others vested in congress, is complete in itself, may be exercised to its utmost extent, and acknowledges no limitations, other than are prescribed in the constitution."[18]

As the U.S. Supreme Court has noted, the power of Congress to regulate commerce extends even to that which is not intended to enter the stream of commerce but may have a substantial economic effect on interstate commerce.[19]

Therefore, the contaminated meat did not need to enter the stream of commerce to be considered adulterated under the FMIA. However, even if that were the case under the FMIA, § 81-2,282 provides:

> (2) Food shall be deemed to be adulterated if:
>
> (a) It bears or contains any substance which may render it injurious to health, considering the quantity of such substance in or on the food;

---

[18] *United States v. Lopez*, 514 U.S. 549, 553, 115 S. Ct. 1624, 131 L. Ed. 2d 626 (1995).

[19] See *Wikard v. Filburn*, 317 U.S. 111, 63 S. Ct. 82, 87 L. Ed. 122 (1942).

(b) It consists in whole or in part of any diseased, contaminated, filthy, putrid, or decomposed substance or is otherwise unsafe for use as food.

A plain reading of § 81-2,282 demonstrates that when food—in this case meat—bears or contains any substance which may render it injurious to health, then the food should be considered adulterated. As the U.S. Court of Appeals for the Eighth Circuit noted *in Am. Home Assur. v. Greater Omaha Packing*,[20]

*E. coli* O157:H7 bacteria live in the digestive tracts of cows and can be transferred to meat during slaughter. Humans become infected by consuming contaminated beef, and the O157:H7 strain is so virulent that even a small dose can make a person ill. Unlike the harmless *E. coli* bacteria commonly found in human intestines, *E. coli* O157:H7 produces Shiga toxins, which cause inflammation of the colon and large intestine, resulting in stomach cramps and bloody diarrhea. Hemolytic uremic syndrome is a severe complication of *E. coli* O157:H7 infection that can cause anemia and kidney damage.

Further, the record demonstrates that the product was processed by GOP and delivered to Meyer before the *E. coli* O157:H7 had been eradicated. Therefore, under Nebraska law, every processed product produced by GOP containing *E. coli* appears to have been adulterated in breach of its express warranties.

The district court determined that as a result of Meyer's accepting and retaining the adulterated meat, Meyer had failed to avail itself of its contracted-for remedy. The court relied on section 19 of the agreement to apply the Uniform Commercial Code. Section 19 states in relevant part that the "nonbreaching party shall be entitled to pursue, in addition to any remedies specifically provided herein, all further remedies then available under the applicable state Uniform Commercial Code or otherwise available at law or in equity." The court

---

[20] *Am. Home Assur. v. Greater Omaha Packing*, 819 F.3d 417, 420 (8th Cir. 2016).

- 524 -

Nebraska Supreme Court Advance Sheets
302 Nebraska Reports
MEYER NATURAL FOODS v. GREATER OMAHA PACKING CO.
Cite as 302 Neb. 509

proceeded to apply § 2-607(2), stating that "'[a]cceptance of goods by the buyer precludes rejection of the goods accepted and if made with knowledge of a nonconformity cannot be revoked because of it unless the acceptance was on the reasonable assumption that the nonconformity would be seasonably cured . . . .'"

However, as noted above, the court's application of article 2 of the Uniform Commercial Code was improper. Specifically, section 19 of the agreement states that the nonbreaching party shall be entitled to "all further remedies then available under the *applicable* state Uniform Commercial Code." (Emphasis supplied.) As previously discussed, article 2 is not applicable to a contract for services that only incidentally involve goods.

Having found that GOP breached the express warranty contained in section 15(a)(iv)(A) of the contract, we return to the fact that Meyer prevented GOP from mitigating the amount of damages by refusing to allow GOP to "rework" the *E. coli* contaminated meat. Additionally, according to the terms of the contract, Meyer could have, but failed to, return more of the adulterated meat for full credit. As a result of Meyer's failure to mitigate the damages, Meyer is not entitled to recover.

*GOP's Alleged Negligence
and Resulting Indemnity.*

Lastly, Meyer assigns that the court erred in finding that GOP was not negligent and therefore not liable for indemnity under the agreement.

As stated above, we will affirm a lower court's grant of summary judgment where the pleadings and admitted evidence show that there is no genuine issue as to any material facts or as to the ultimate inferences that may be drawn from those facts and that the moving party is entitled to judgment as a matter of law. The Restatement (Third) of Torts states:

> A person acts negligently if the person does not exercise reasonable care under all the circumstances. Primary factors to consider in ascertaining whether the person's

conduct lacks reasonable care are the foreseeable likeli-hood that the person's conduct will result in harm, the foreseeable severity of any harm that may ensue, and the burden of precautions to eliminate or reduce the risk of harm.[21]

In support of its argument, Meyer alleges that reports of GOP workers violating GOP's own sanitation procedures on days surrounding the fabrication of Meyer's cattle, and the failure of supervisors to investigate those reports, raised a genuine issue of material fact precluding summary judgment.

Meyer argues that it raised valid sanitary issues, specifically in regard to three instances of sterilization violations on the part of GOP employees, within 5 days of the "event day" date, which provided sufficient evidence to suggest that negligence occurred on the "event day." However, Meyer did not present any evidence of negligence on the "event day."

The district court noted, and the parties agreed at oral argu-ments, that *E. coli* has historically occurred in the production of raw beef products. The district court concluded that Meyer had failed to present any evidence to the court to suggest any negligence occurred on the days in which Meyer's cattle were fabricated. Based on the evidence presented and our standard of review, we agree with the district court.

## CONCLUSION

Although the district court incorrectly applied the Uniform Commercial Code in regard to Meyer's acceptance of adulter-ated meat under the agreement, the court nevertheless arrived at the correct result. Therefore, the decision of the district court is affirmed.

AFFIRMED.

---

[21] 1 Restatement (Third) of Torts: Liability for Physical and Emotional Harm § 3 at 29 (2010).