Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
05/08/2020 08:17 AM CDT

DH-1, LLC, a Nebraska limited liability
company, et al., appellants, v. City of
Falls City, Nebraska, appellee.

___ N.W.2d ___

Filed February 14, 2020.    No. S-19-039.

1. **Summary Judgment: Appeal and Error.** An appellate court affirms a lower court's grant of summary judgment if the pleadings and admitted evidence show that there is no genuine issue as to any material facts or as to the ultimate inferences that may be drawn from the facts and that the moving party is entitled to judgment as a matter of law.

2. **____: ____.** In reviewing a summary judgment, an appellate court views the evidence in the light most favorable to the party against whom the judgment was granted, and gives that party the benefit of all reasonable inferences deducible from the evidence.

3. **Contracts.** The interpretation of a contract and whether the contract is ambiguous are questions of law subject to independent review.

4. **Standing: Jurisdiction.** The question whether a party has standing is jurisdictional and may be raised at any time.

5. **Contracts: Attorney and Client.** The construction of contracts between attorneys and their clients as to compensation is to be governed by the usual rules relating to the construction of agreements generally.

6. **Contracts.** A contract written in clear and unambiguous language is not subject to interpretation or construction and must be enforced according to its terms.

7. **Contracts: Words and Phrases.** A contract is ambiguous when a word, phrase, or provision in the contract has, or is susceptible of, at least two reasonable but conflicting interpretations or meanings.

8. **Contracts.** A determination as to whether an ambiguity exists in a contract is to be made on an objective basis, not by the subjective contentions of the parties; thus, the fact that the parties have suggested opposite meanings of a disputed instrument does not necessarily compel the conclusion that the instrument is ambiguous.

9. ____. Where a contract is found to be ambiguous, it is construed against the drafter.
10. **Contracts: Appeal and Error.** An appellate court will not rewrite a contract to provide terms contrary to those which are expressed. Nor is it the province of a court to rewrite a contract to reflect the court's view of a fair bargain.
11. **Contracts: Unjust Enrichment: Quantum Meruit.** A claim that a court should imply a promise or obligation to prevent unjust enrichment goes by a number of names—"quasi-contract," "implied-in-law contract," or "quantum meruit."
12. **Contracts.** An express contract claim supersedes a quasi-contract claim arising out of the same transaction to the extent that the contract covers the subject matter underlying the requested relief.
13. ____. In the situation where both a contract claim and a quasi-contract claim are alleged, a court should address the contract claim first.

Appeal from the District Court for Lancaster County: Susan I. Strong, Judge. Affirmed.

J.L. Spray and Patricia L. Vannoy, of Mattson Ricketts Law Firm, for appellants.

Michael R. Dunn, of Halbert, Dunn & Halbert, L.L.C., for appellee.

Miller-Lerman, Cassel, Stacy, Funke, Papik, and Freudenberg, JJ.

Freudenberg, J.

INTRODUCTION

This case presents the interpretation of a contingent fee for legal services between the City of Falls City, Nebraska (Falls City), and two law firms—Houghton Bradford Whitted, PC, LLO, and Weaver & Merz, a partnership. The district court concluded that no fees were due under the agreement or on the firms' equitable claim and accordingly dismissed the actions. The law firms and DH-1, LLC, the organization to which the firms had assigned their rights under the fee agreement, appealed. We refer to the law firms and DH-1 collectively as "the firms." We affirm.

## BACKGROUND

*Underlying Litigation.*

This is the third appearance before this court by Falls City in relation to the underlying litigation. We set forth the facts of the underlying organizations—the Nebraska Municipal Power Pool (NMPP), the Municipal Energy Agency of Nebraska (MEAN), the National Public Gas Agency (NPGA), the American Public Energy Agency (APEA), and the Central Plains Energy Project (CPEP)—and the underlying litigation in our first opinion, decided in 2010:

NMPP was created in 1975 as a nonprofit corporation with the purpose of idea generation, research, analysis, administration, and the creation of other entities to carry out these activities. NMPP has a 16-member board of directors made up of representatives from the participating municipalities. Falls City is a member of NMPP.

The first entity created by NMPP in 1981 was [MEAN] . . . . NMPP created MEAN in order to obtain efficient sources of electricity for participating communities. [NPGA] was created in 1991 by NMPP in order to secure natural gas for the participating municipalities. . . . NPGA is governed by a board of directors made up of a representative from each of the NPGA-member municipalities, including Falls City. Both MEAN and NPGA require their members to also be members of NMPP.

NMPP provides all the strategic planning and staffing services for NPGA and MEAN. Other than an executive director, who is employed jointly by NPGA and MEAN, neither organization has employees. NMPP's budgeting process is administered through a joint operating committee, which consists of representatives from NMPP, NPGA, and MEAN. At the beginning of each year, the amount of time each NMPP employee will devote to a particular organization is estimated and expenses are then allocated among the organizations.

In 1995, NMPP, NPGA, and MEAN created APEA, another interlocal agency. APEA was intended to finance bonds through which natural gas was purchased. APEA remained separate from the joint operating committee and had its own staff, but sometimes utilized NMPP staff for various projects.

APEA issued bonds and purchased gas through a series of "prepays." A prepay involves the purchase of a large supply of natural gas to be delivered in the future. The goal is to purchase a large amount of natural gas at a lower price than index, or market, price. The bonds used to pay for the gas are tax exempt as long as municipal entities purchase the gas later. As the gas is delivered and paid for by the end user, the proceeds are used to repay the principal and interest on the bonds.[1]

The complaint filed by Falls City against NMPP, CPEP, and several individual defendants alleged breach of contract, breach of fiduciary duty, and conspiracy to cause injury to Falls City and others. As relevant, the district court found in favor of Falls City in the amount of $628,267.90. In our 2010 opinion, we reversed the district court's award of damages to Falls City on the ground that Falls City lacked standing.[2] The parties again appeared in 2011, this time with respect to the order on costs assessed against Falls City.[3] Upon remand, the district court entered an order assessing 22 percent of the costs to Falls City, which this court affirmed. The appeal now before us deals with a fee dispute between Falls City and the attorneys representing Falls City in the prior litigation.

---

[1] *City of Falls City v. Nebraska Mun. Power Pool*, 279 Neb. 238, 240-41, 777 N.W.2d 327, 330-31 (2010).

[2] *City of Falls City v. Nebraska Mun. Power Pool, supra* note 1.

[3] *City of Falls City v. Nebraska Mun. Power Pool*, 281 Neb. 230, 795 N.W.2d 256 (2011).

*Fee Agreement.*

On November 20, 2006, Falls City and the firms entered into the contingency fee agreement now at issue in this appeal. As relevant, that agreement provided that Falls City retained the firms

> for the prosecution of any claims that Falls City may have and any claims Falls City may pursue on behalf of MEAN, NPGA, NMPP or any of their members including those who might join in the prosecution of these claims individually or by virtue of a class action or who might benefit from any common fund created, discovered, increased, preserved or protected or property to which they may have a claim, against any person or entity thought to be responsible for damages sustained as a result of actions by NMPP, its employees or CPEP.

For this work, the firms were entitled to "$15,000.00 as an Initial Fee" and a "contingent fee based upon the following schedule: (a) 40% of all amounts recovered by settlement or verdict which is not appealed; or, (b) 50% of all amounts recovered in the event of an appeal of a verdict by any party involved in the lawsuit." The agreement indicates that it applied to "relief in addition to, or in lieu of, an immediate monetary benefit, but which relief has a calculable present value"; "securities, or other non-cash assets"; "or[,] if the settlement of this case is made by a structured settlement[,] . . . the present value of the settlement."

While the action filed against NMPP and others proceeded in district court, APEA, NPGA, and MEAN entered into an agreement on February 26, 2007, which dissolved and restructured APEA and equitably distributed its assets. NPGA and MEAN withdrew from APEA, with the withdrawal agreement dividing the $23.1 million held by APEA between NPGA and MEAN. NPGA received $9.8 million. Though Falls City was not a party to the withdrawal agreement, as a member of NPGA it received $1,567,570.02. Thereafter, Falls City elected to become a direct member of APEA.

The firms sought payment under the contingency fee agreement, based upon the funds Falls City received pursuant to the withdrawal agreement and improved equity positions in the various organizations, but Falls City declined to pay. The firms then assigned their claims to DH-1, which filed suit on January 14, 2015, for the fee under the contingency agreement. Eventually, a second amended complaint was filed which joined the firms for purposes of their equitable claims. In total, the firms sought $1,487,785.60 consisting of (1) a $627,028 fee from the APEA distribution, (2) $564,197.60 as a fee for Falls City's interest in the APEA, (3) $40,000 for the increase in Falls City's equity interest in NPGA, and (4) $256,560 for the value of the "Agreement for Termination of Participation of Members, Distribution of Funds to Members, and for Complete Settlement, Mutual Releases and Covenants" entered into between MEAN, NPGA, and APEA.

On October 10, 2017, the district court granted Falls City's motion for summary judgment as to the claims under the fee agreement, concluding that the contingency under the fee agreement was not met and that thus, the firms were not entitled to a fee under the agreement. The district court also held that DH-1's standing was limited to legal rights under the fee agreement and that it had "no equitable rights to assert against Falls City." However, the district court granted DH-1's motion to file a second amended complaint. DH-1 did so, adding the firms as parties to the litigation.

At a hearing on December 21, 2018, ostensibly held with regard to Falls City's motion to compel, Falls City orally moved for summary judgment. The firms waived notice, and a hearing was held at which evidence was offered. The district court granted the motion for summary judgment and dismissed the complaint.

## ASSIGNMENTS OF ERROR

The firms assign that the district court erred in dismissing both their contract and equitable claims.

## STANDARD OF REVIEW

[1,2] An appellate court affirms a lower court's grant of summary judgment if the pleadings and admitted evidence show that there is no genuine issue as to any material facts or as to the ultimate inferences that may be drawn from the facts and that the moving party is entitled to judgment as a matter of law.[4] In reviewing a summary judgment, an appellate court views the evidence in the light most favorable to the party against whom the judgment was granted, and gives that party the benefit of all reasonable inferences deducible from the evidence.[5]

[3] The interpretation of a contract and whether the contract is ambiguous are questions of law subject to independent review.[6]

## ANALYSIS

*Statute of Limitations and Standing.*

Before reaching the substantive issues presented by this appeal, we turn to Falls City's arguments regarding the statute of limitations and standing.

Falls City argues that the district court erred in not ruling that the statute of limitations had run on all of the firms' claims. But Falls City failed to file a cross-appeal on this issue, and therefore, such issue is not properly before us, which prevents us from reaching it.[7]

[4] Falls City's argument regarding standing is different in that the question whether a party has standing is jurisdictional and may be raised at any time.[8] Specifically, Falls City argues that the firms have assigned, at least, their legal claims to DH-1, which Falls City argues is an unlicensed collection

[4] *Williamson v. Bellevue Med. Ctr.*, 304 Neb. 312, 934 N.W.2d 186 (2019).

[5] *Id.*

[6] *Wintroub v. Nationstar Mortgage*, 303 Neb. 15, 927 N.W.2d 19 (2019).

[7] See *In re Estate of Graham*, 301 Neb. 594, 919 N.W.2d 714 (2018).

[8] See *Hawley v. Skradski*, 304 Neb. 488, 935 N.W.2d 212 (2019).

agency and as a result lacks standing. We disagree. The record shows that the firms assigned their claims to DH-1. That assignment was not challenged below. As the assignee, DH-1 is the real party in interest and has standing to bring suit in this case.[9]

We disagree with Falls City's argument to the contrary.

*Recovery Under Fee Agreement.*

[5-8] We now turn to the firms' argument that, contrary to the district court's conclusion, they were entitled to a fee under the contingency fee agreement. The construction of contracts between attorneys and their clients as to compensation is to be governed by the usual rules relating to the construction of agreements generally.[10] A contract written in clear and unambiguous language is not subject to interpretation or construction and must be enforced according to its terms.[11] A contract is ambiguous when a word, phrase, or provision in the contract has, or is susceptible of, at least two reasonable but conflicting interpretations or meanings.[12] A determination as to whether an ambiguity exists in a contract is to be made on an objective basis, not by the subjective contentions of the parties; thus, the fact that the parties have suggested opposite meanings of a disputed instrument does not necessarily compel the conclusion that the instrument is ambiguous.[13]

[9,10] Where a contract is found to be ambiguous, it is construed against the drafter.[14] This court will not rewrite the contract to provide terms contrary to those which are expressed.

---

[9] See Neb. Rev. Stat. §§ 25-301 and 25-302 (Reissue 2016). See, also, *Hawley v. Skradski, supra* note 8.

[10] 7A C.J.S. *Attorney & Client* § 457 (2019).

[11] *Meyer Natural Foods v. Greater Omaha Packing Co.*, 302 Neb. 509, 925 N.W.2d 39 (2019).

[12] *Id.*

[13] *Id.*

[14] See *Beveridge v. Savage*, 285 Neb. 991, 830 N.W.2d 482 (2013).

Nor is it the province of a court to rewrite a contract to reflect the court's view of a fair bargain.[15]

To support their argument that they are entitled to a fee under the agreement, the firms note that the fee agreement was broad both because it covered the "prosecution of any claims that Falls City may have and any claims Falls City may pursue" on behalf of a myriad of organizations or members of those organizations and because it included language allowing a fee to be recovered on the "receipt of securities, or other non-cash assets," or on the present value of a structured settlement.

The firms further contend that the district court erred in limiting the terms "prosecution," "verdict," and "settlement" to the context of formal litigation and that Falls City received benefits because of the underlying litigation even though Falls City did not ultimately obtain a verdict or settlement with the defendants in that litigation.

We find no error in the decision of the district court. Our analysis begins with the plain language of the opening paragraph of the parties' fee agreement. That agreement, which was entered into in November 2006, states that the firms were retained to pursue claims "against any person or entity thought to be responsible for damages sustained as a result of actions by NMPP, its employees or CPEP." In addition to setting forth the 40- to 50-percent contingency fee owed in the event of recovery, the agreement also notes that the firms are entitled to "$15,000.00 as an Initial Fee . . . for the initial investigation . . . and drafting of the Complaint." It also states that the firms were employed to "prosecute *such claims* and assign to them a lien against all amounts recovered by settlement or otherwise in connection with *this litigation*" (emphasis supplied).

When read together, this language plainly envisions the agreement's applying to the litigation as set forth in the

---

[15] *Meyer Natural Foods v. Greater Omaha Packing Co., supra* note 11.

complaint filed against NMPP, CPEP, and others alleging breach of contract, breach of fiduciary duty, and conspiracy to cause injury to Falls City and others. By contrast, the agreement did not encompass other services the firms might provide to Falls City.

The firms assert that the withdrawal agreement is within the consideration of the agreement. However, the firms have failed to establish what work they completed with regard to the withdrawal agreement and how such work would bring the withdrawal agreement within the parameters of the agreement's delineated list of claims. Therefore, since no recoverable verdict or settlement occurred from the specified claims set forth in the agreement, the contingency has not been met requiring the payment of a fee.

There is no merit to the firms' claim that they were entitled to a fee under the agreement.

*Recovery Under Equitable Principles.*

[11] The firms also assign that the district court erred in granting summary judgment in favor of Falls City on its equitable claims. A claim that a court should imply a promise or obligation to prevent unjust enrichment goes by a number of names—"quasi-contract," "implied-in-law contract," or "quantum meruit."[16] Such claims do not arise from an express or implied agreement between the parties; rather, they are imposed by law "'when justice and equity require the defendant to disgorge a benefit that he or she has unjustifiably obtained at the plaintiff's expense.'"[17]

[12] Unjust enrichment or quasi-contract claims are viable only in limited circumstances. For example, "'[t]he terms of an enforceable agreement normally displace any claim of unjust

---

[16] *Bloedorn Lumber Co. v. Nielson*, 300 Neb. 722, 915 N.W.2d 786 (2018).

[17] *Id.* at 729, 915 N.W.2d at 792, quoting *City of Scottsbluff v. Waste Connections of Neb.*, 282 Neb. 848, 809 N.W.2d 725 (2011).

enrichment within their reach.'"[18] Put another way, an express contract claim will supersede a quasi-contract claim arising out of the same transaction to the extent that the contract covers the subject matter underlying the requested relief.[19]

[13] Though contract claims supersede unjust enrichment or quasi-contract claims, a plaintiff is permitted to allege both.[20] We have said that when a plaintiff does so, a court should address the contract claim first.[21]

In this case, there was a contract, the contingency fee agreement, which expressly covered the litigation against NMPP. This agreement superseded the equitable claims to the extent of that contract. Thus, the issue presented is what work not covered by the fee agreement remains unpaid. There is no dispute that the firms would be entitled to compensation for work done on matters not covered by the fee agreement.

Additional factual background is helpful to analyzing this issue. During the course of this litigation, the parties had engaged in discovery. As relevant, Falls City sought information regarding services provided by the firms, including "[w]hether the service provided related to the withdrawal agreement[, the] membership agreement[,] or some other service the [firms] claim to have provided not covered by the contingency fee agreement." To Falls City's interrogatory, the firms responded as follows:

> The firm[s were] retained by [Falls] City to represent [Falls] City and its related entities in efforts to protect their interests and those of other community members of NMPP, MEAN and NPGA in [APEA,] which at the time

---

[18] *City of Scottsbluff v. Waste Connections of Neb.*, 282 Neb. at 860, 809 N.W.2d at 740, quoting Restatement (Third) of Restitution and Unjust Enrichment § 2, comment *c.* (2011).

[19] *Bloedorn Lumber Co. v. Nielson, supra* note 16.

[20] *Id.*

[21] *Id.*

was holding funds in excess of $20 Million and had valuable, proprietary, and profitable business interests. The firm[s were] to file a legal action against individuals and entities attempting to take APEA's assets and business. There was no "contingency fee agreement" when the firm[s were] initially retained by [Falls] City. After the firm[s] filed the action and [were] in the midst of discovery, [Falls] City . . . requested that the firm[s] proceed on a "contingency fee agreement." At all times, the scope of the engagement covered all efforts exerted by the firm[s] for a percentage of all benefits derived from the attorney-client relationship.

According to various motions to compel filed by Falls City, counsel attempted to clarify or get the firms to supplement this answer, but the firms stated they had no further answer. Following a hearing, Falls City's motion to compel was granted, with the district court's order noting:

[Falls City] seek[s] to have [the firms] specify what services were provided or what hours were spent outside the contingency fee agreement for which they have not yet been compensated (under any other agreement) and for which . . . Falls City received a benefit. Whether [the firms] can recover under an implied contract or other equitable theory of relief depends on whether they can show that they performed some services for the benefit of [Falls City] such that [Falls City] should be made to pay the reasonable value of those services. *See Sorenson v. Dager*, 8 Neb. App. [729], 601 N.W.2d 564 (1999). [The firms] have a duty to comply with the discovery requests by going through their time records and specifying such services. It was not sufficient for [the firms] to simply direct [Falls City] to hundreds of time records which have already been produced, especially if most of those services were expended in performance of the contingency fee agreement.

The firms were given 30 days to supplement their answers. No supplementation occurred, and Falls City filed another motion to compel. That motion was converted, with the agreement of all parties, to Falls City's motion for summary judgment, which was granted, dismissing the firms' equitable claims.

For Falls City to obtain such relief as the defendant in this litigation, Falls City had to show that if this case proceeded to trial, the firms' equitable claims would not have been successful, and that Falls City was entitled to judgment.[22] Falls City did so by first relying on case law that showed that equitable claims based on actions which were covered by the contingency fee agreement should be determined under legal principles and not under equity. Given this, the only claims remaining could be those claims not covered by the contingency agreement. Because the firms, in their answers to interrogatories, declined to set forth any work they completed on behalf of Falls City outside of the contingency fee agreement, Falls City met its burden and was entitled to summary judgment.

There is no merit to the firms' equitable claim.

## CONCLUSION

The decision of the district court is affirmed.

AFFIRMED.

HEAVICAN, C.J., not participating.

---

[22] See *Williamson v. Bellevue Med. Ctr., supra* note 4.