Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
06/25/2021 08:10 AM CDT

John M. Wizinsky, appellant, v.
State of Nebraska, appellee.
___ N.W.2d ___

Filed April 2, 2021.    No. S-19-1159.

1. **Tort Claims Act: Appeal and Error.** A district court's findings of
   fact in a proceeding under the State Tort Claims Act, Neb. Rev. Stat.
   § 81-8,209 et seq. (Reissue 2014), will not be set aside unless such find-
   ings are clearly erroneous.
2. **Judgments: Appeal and Error.** In reviewing a judgment awarded
   in a bench trial of a law action, an appellate court does not reweigh
   evidence, but considers the evidence in the light most favorable to the
   successful party and resolves evidentiary conflicts in favor of the suc-
   cessful party, who is entitled to every reasonable inference deducible
   from the evidence.
3. **Jurisdiction.** Whether a court has subject matter jurisdiction is a
   threshold issue.
4. **Tort Claims Act: Immunity: Waiver.** The State Tort Claims Act oper-
   ates as a limited waiver of the sovereign immunity of the State, but is
   subject to statutory exceptions.
5. **Tort Claims Act.** The purpose of the discretionary function exception
   of the State Tort Claims Act is to prevent judicial "second-guessing" of
   legislative and administrative decisions grounded in social, economic,
   and political policy through the medium of action in tort.
6. ____. In determining whether the discretionary function exception
   applies, the focus is on the nature of the conduct, rather than the status
   of the actor. For purposes of the State Tort Claims Act, a discretionary
   function or duty encompasses policy judgment.
7. **Tort Claims Act: Political Subdivisions.** A two-part analysis deter-
   mines whether the discretionary function exception of the State Tort
   Claims Act applies. First, the court must consider whether the action
   is a matter of choice for the acting political subdivision or employee.

Second, if the court concludes that the challenged conduct involves an element of judgment, it must then determine whether that judgment is of the kind that the discretionary function exception was designed to shield.

Appeal from the District Court for Lancaster County: Kevin R. McManaman, Judge. Affirmed.

Joy Shiffermiller, of Shiffermiller Law Office, P.C., L.L.O., for appellant.

Douglas J. Peterson, Attorney General, and Stephanie Caldwell for appellee.

Heavican, C.J., Miller-Lerman, Cassel, Stacy, Funke, and Papik, JJ.

Per Curiam.

## NATURE OF CASE

Appellant, John M. Wizinsky, brought this negligence action for damages against the State under Nebraska's State Tort Claims Act (STCA), Neb. Rev. Stat. § 81-8,209 et seq. (Reissue 2014). Wizinsky was an inmate at the Tecumseh State Correctional Institution (TSCI) during the riots which occurred there on Mother's Day in 2015. Wizinsky had been in protective custody at the time of the riots, and he suffered from medical conditions, including post-traumatic stress disorder and diabetes. He claimed that due to negligence of the State of Nebraska's Department of Correctional Services, he was improperly commingled with general population inmates and placed at serious risk, causing his post-traumatic stress disorder symptoms to be exacerbated. Following a 4-day trial, the district court for Lancaster County found in favor of the State on all claims. Because the State is immune from Wizinsky's claims under the discretionary function exception of the STCA, we affirm the judgment of the district court in favor of the State.

STATEMENT OF FACTS

On Mother's Day, May 10, 2015, the inmates at TSCI engaged in violent riots. At the time of the riots, Wizinsky was an inmate in a protective custody wing of a housing unit at TSCI. Beginning at approximately 2:30 p.m. and lasting through the night, inmates set fires, committed assaults, and destroyed property in multiple locations and housing units. Inmates seized control of some areas of the facility. Staff orders to lock down were refused on a widespread scale. Two persons died as a result of the riots.

Wizinsky alleged that TSCI was not properly staffed and that during the riots, the Department of Correctional Services failed to use reasonable care to protect him from general population inmates; failed to prevent the riots; and failed to use reasonable care to maintain security and have response teams available, resulting in worsening of his health conditions.

*The Riots.*

The riots began after the yard supervisor called for inmates to report to medical lines, which involved general population inmates walking across the main yard to the medical building window. Protective custody inmates were not subject to the call. The yard supervisor noticed a general population inmate walking in the wrong direction, and she used her radio to request assistance. Staff arrived at the main yard at approximately 2:41 p.m., and an inmate fight broke out. During the fight, inmates physically attacked a staff member, pushed him to the ground, and attempted to stomp on his skull. The yard supervisor requested all available backup staff and called for staff onsite designated as emergency personnel, known as the emergency response teams. The three emergency response teams are composed of staff from across the system, trained to respond in the event of a declared emergency. When the situation began to escalate, staff declared an emergency, and the shift supervisor, Christopher Ulrick, assumed the position of "Initial Incident Commander" (Incident Commander) and established a command post.

The riots spread to other areas and continued to escalate. A group of inmates in the gymnasium held a female staff member hostage and threatened sexual assault. Inmates in the main yard attempted to break into the gymnasium windows. Security staff fired warning shots from the guard towers. Eventually, unarmed staff in the yard retreated.

Wizinsky's unit was initially secured by staff, and the doors were locked in the wings. However, two general population groups located in wings on opposite sides of the housing unit refused to lock down and began starting fires and threatening staff with makeshift weapons. Staff members from Wizinsky's unit told the central control that they were unable to lock down their inmates. Incident Commander Ulrick directed them to secure themselves, and staff retreated to a control room. Inmates began barricading doors, covering control and gallery windows, moving furniture out to the "miniyards," and disabling cameras. Inmates attempted to "smoke out" the staff who had retreated to the control room of the housing unit.

Tactical teams gathered and reported, briefed, collected intelligence, and eventually deployed on the TSCI yard. They decided to clear the staff held hostage in the gymnasium and in the smoke-filled control centers of the housing units. Radio communication was not always possible during this period because of the smoke and fire, as well as the water from the overhead sprinklers.

As the fires continued, Wizinsky's housing unit began to fill with thick smoke, endangering the inmates in the unit. The command staff decided to evacuate Wizinsky's unit. However, rather than evacuate protective custody inmates in the manner outlined in the standard fire evacuation procedure, keeping them separate at all times from other inmates, command staff gave the inmates the option to evacuate to a different miniyard, even though this decision would mix inmates from protective custody and general population units. Prison staff were not available to escort the inmates to the miniyards as was normally indicated. Incident Commander Ulrick testified that he

decided to send all inmates in Wizinsky's unit to yards where there was more space for them and more visibility. Wizinsky evacuated to avoid the smoke and eventually returned to his housing unit, where he gathered with a group of protective custody inmates in a locked cell for the rest of the day, playing cards.

*Security Plans and Decisions.*

TSCI staff responding to riots were guided by policies and procedures in the "Incident Action Plan" (Action Plan), which overrides other orders in the event of an emergency. The Action Plan set forth "guidelines for [TSCI] staff" responding to inmate disturbances and riots to maintain a safe environment for staff, visitors, and inmates. The Action Plan instructed staff to make the initial assessment of the emergency and determine the appropriate course of action, taking into consideration various risk factors. The Action Plan permits the central control staff, the Incident Commander, and the emergency response teams to, inter alia, "[c]onsider," "[a]ssess," "[i]dentify," "make immediate determination" on the situation and available resources, and "[d]evelop an immediate plan to reduce the risks involved." The Action Plan stated that during an incident, the shift supervisor on duty will serve as the Incident Commander until relieved by transfer of command to the warden or his or her designee. To isolate and contain the situation, staff were to utilize all available resources and were empowered to evacuate uninvolved inmates from the affected areas.

Incident Commander Ulrick testified for the State. Ulrick was the Incident Commander at the time of the riots who directed the staff to contain and secure themselves in the housing unit control center. He testified that this appeared to be the best course of action to avoid additional staff assaults and possible hostage situations that would give the rioting inmates more control. After the staff secured themselves by barricading themselves in the control center, inmates in two of the

galleries attempted to break in and force burning items into the room.

The State's expert, Eugene Atherton, worked in corrections for over 43 years, including service at the Colorado Department of Corrections as the warden of the Colorado State Penitentiary and director of prisons and has coauthored a book about preventing and managing riots. He testified that Ulrick, as Incident Commander, complied with the incident command principles and that actions done in response to the TSCI riot met or exceeded all correctional standards of emergency management. He testified that nonarmed staff or nondesignated special team staff are not expected to place themselves in positions where serious harm is likely to occur in order to protect others. According to Atherton, staff who sought shelter when faced with threats and fires acted in accordance with nationwide standards for adult prison systems.

*TSCI Staffing.*

Wizinsky testified at trial that over time, he had noticed fewer staff members in the yard. The warden of TSCI testified that as warden, he had trouble retaining staff, and that the turnover rate was high. Wizinsky submitted a "critical incident report" created after the riots, which identified the minimum staffing requirement for the shift as 61 and stated that the total number of staff on duty on the shift was 57.

In contrast, other evidence at trial established that in the context of the afternoon of the riots, the minimum staff number was 57. The critical incident report also showed that additional program and recreational staff were absent in nonsecurity personnel posts due to prescheduled planned closures of those areas, explaining why there were 57, not 61, staff members. Incident Commander Ulrick also testified that mandatory posts at TSCI were filled and that additional staff resources were quickly called in to secure the facility, including additional TSCI personnel working overtime, special response teams, and Nebraska State Patrol and Johnson County emergency personnel.

Atherton, as the State's expert, opined that during the riots, staffing numbers were normal and consistent with the requirements of the Department of Correctional Services for TSCI, where staffing plans had been developed by trained professionals making reasonable decisions for staffing requirements for that facility. Atherton also opined that it was reasonable for response teams to develop a plan to prioritize the response to the rioting and that thus, their deployment was not delayed, because they were preparing and strategizing.

The State offered an accreditation report of TSCI by the American Correctional Association, which, inter alia, set goals and objectives for minimum safety levels and required compliance audits for a period of 3 years. The 2013 accreditation report concluded that TSCI met all mandatory American Correctional Association standards and 438 of 440 nonmandatory standards, including such goals as facility demographics, security, fire safety, inmate populations, housing numbers, staffing numbers, facility operational capacities, and housing unit layouts and bed assignments.

With respect to design capacity, Atherton testified that there was no support for the claim that housing more inmates than the design contributed to the conditions that led to the riots. He distinguished between design capacity and operational capacity, the latter of which was the nationally recognized standard for inmate capacity. TSCI passed American Correctional Association accreditation for design capacity in 2013 and accreditation for operational capacity in 2015.

*Wizinsky's Injuries.*

Prior to the riots, Wizinsky had been diagnosed with posttraumatic stress disorder, depression, paranoia, anxiety, bad dreams, trouble sleeping, and other mental health conditions. He also received sliding-scale insulin therapy twice a day for his diabetes. Normally, he received the insulin therapy each morning and afternoon. Wizinsky testified that on the day of the riots, he missed a dose of the insulin therapy in the

evening and felt his blood sugar was low. He was caught up on the missed dose the next morning, and he testified on cross-examination that he had no lasting effects.

Wizinsky testified that he observed violence, including an inmate kneeing and striking another inmate over the head with a lock. He further testified that while in the riots, he "was hit once and that was about it as far as being injured"; he denied feeling physical injuries, because he said he went numb and fought off the pain. Wizinsky testified that he continues to have violent, bad dreams and panic attacks.

*District Court Order.*

In its written order following trial, the district court found that the State was not negligent and that Wizinsky failed to prove he had suffered a legal injury proximately caused by the claimed negligence. Additionally, the court found that Wizinsky's claims were barred by the doctrine of sovereign immunity under the STCA. The court found that the allegations "were all based on the discretion, actions and tactical decisions of the state employees during the riot" and that Wizinsky's proof "did not escape the realm of the discretionary function exception."

Wizinsky appeals.

## ASSIGNMENTS OF ERROR

Wizinsky assigns, summarized and restated, that the district court erred when it found that (1) the discretionary function exception barred Wizinsky's claim and (2) Wizinsky did not prove his causes of action for negligence.

## STANDARDS OF REVIEW

[1,2] A district court's findings of fact in a proceeding under the STCA will not be set aside unless such findings are clearly erroneous. *Dean v. State*, 288 Neb. 530, 849 N.W.2d 138 (2014). In reviewing a judgment awarded in a bench trial of a law action, an appellate court does not reweigh evidence, but considers the evidence in the light most favorable to the

successful party and resolves evidentiary conflicts in favor of the successful party, who is entitled to every reasonable inference deducible from the evidence. *Mays v. Midnite Dreams*, 300 Neb. 485, 915 N.W.2d 71 (2018).

## ANALYSIS

[3] Whether a court has subject matter jurisdiction is a threshold issue. *Lambert v. Lincoln Public Schools*, 306 Neb. 192, 945 N.W.2d 84 (2020). As explained below, because we determine that Wizinsky's claims against the State are barred by the discretionary function exception to the waiver of sovereign immunity under the STCA, we do not reach his substantive claims of negligence.

*Sovereign Immunity and the*
*Discretionary Function.*

[4] Neb. Const. art. V, § 22, provides: "The state may sue and be sued, and the Legislature shall provide by law in what manner and in what courts suits shall be brought." The STCA operates as a limited waiver of the sovereign immunity of the State, but is subject to statutory exceptions. The State retains its sovereign immunity with respect to certain listed exceptions found in the STCA. See § 81-8,219. In particular, the STCA contains a "discretionary function" exception to the waiver of sovereign immunity for certain claims. According to the exception, the STCA shall not apply to, inter alia:

> Any claim based upon an act or omission of an employee of the state, exercising due care, in the execution of a statute, rule, or regulation, whether or not such statute, rule, or regulation is valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a state agency or an employee of the state, whether or not the discretion is abused.

§ 81-8,219(1).

In other words, the State has not waived immunity for any claim based on the performance or nonperformance of a

discretionary function or duty. See *Holloway v. State*, 293 Neb. 12, 875 N.W.2d 435 (2016).

[5] The purpose of the discretionary function exception of the STCA is to prevent judicial "second-guessing" of legislative and administrative decisions grounded in social, economic, and political policy through the medium of action in tort. *Lambert v. Lincoln Public Schools, supra*. An example of a discretionary function is a judgmental decision made within a broad regulatory framework lacking specific standards. *Kimminau v. City of Hastings*, 291 Neb. 133, 864 N.W.2d 399 (2015).

[6] We have consistently applied the foregoing principles, but we have not always articulated them in a disciplined manner. We take this opportunity to do so. Broadly speaking, actors at the highest level of government are more likely as a general matter to be engaged in policy decisions to which the discretionary function exception applies than actors at the operational level, where the spectrum of acts from discretionary to merely ministerial is on greater display. But that does not mean that the discretionary function exception can never apply at the operational level. In determining whether the discretionary function exception applies, thereby shielding the actor from liability, the focus is on the nature of the conduct, rather than the status of the actor. *Holloway v. State, supra*. For STCA purposes, a discretionary function or duty encompasses policy judgment. Under the STCA, the performance or nonperformance of a discretionary function, regardless of the level of the actor, cannot be the basis of liability, because the statutory discretionary function exception applies. *Holloway v. State, supra*. See § 81-8,219(1).

[7] A two-part analysis determines whether the discretionary function exception of the STCA applies. *Lambert v. Lincoln Public Schools*, 306 Neb. 192, 945 N.W.2d 84 (2020). First, the court must consider whether the action is a matter of choice for the acting political subdivision or employee. *Id*. Second, if the court concludes that the challenged conduct

involves an element of judgment, it must then determine whether that judgment is of the kind that the discretionary function exception was designed to shield. *Id*.

*Wizinsky's Claims.*

We begin with Wizinsky's claims that staffing at TSCI was insufficient and that the prison was beyond its capacity. We agree with the district court that the discretionary function exemption shields the State from liability, because decisions to set staffing requirements and operational capacity are matters of policy. Evidence at trial was that the prison met its minimum staffing requirements on the day of the riots and was in compliance with its operational inmate capacity. We have previously explained that the utilization of staff is an administrative decision grounded in social, economic, and political policy, and it falls within the discretionary function exception. See *id*. Wizinsky's argument to the contrary is without merit.

Wizinsky's remaining claims identify the alleged failure during the riots of prison administrators and officials, including Incident Commander Ulrick, the warden, and the various emergency response teams, to take certain measures to secure protective custody inmates and guarantee their safety and medical needs. Decisions on where to allocate security forces, how to implement evacuation plans, when to retreat, where to deploy emergency response teams, and all other conduct Wizinsky claims was negligent are of a discretionary nature. Wizinsky contends that TSCI policies, especially nonemergency policies, prescribed courses of action for prison officials to follow in all situations, including prison uprisings. However, our review of the relevant TSCI policies and procedures, including the Action Plan, shows that they provide a broad set of guidelines which allowed prison officials and emergency response teams discretion to assess a developing uprising, plan an appropriate response, and deploy resources accordingly. As noted above, the Action Plan permits the TSCI central control staff and emergency response teams to

"[c]onsider," "[a]ssess," "[i]dentify," "[d]etermine," and evaluate responses that are "appropriate" and "possible"—all hallmarks of situational discretion. For example, with respect to Incident Commander Ulrick's order to evacuate Wizinsky's unit in a different manner than was typical, this decision was based on the fires proximate to Wizinsky's unit, poor visibility rendering normal video security ineffective, and the fact that staff was needed in other locations and was unable to escort inmates individually. Numerous jurisdictions have held that response strategies to prison uprisings and riots are discretionary. For example, in *Buchanan v. U.S.*, 915 F.2d 969, 971 (5th Cir. 1990), the Court of Appeals for the Fifth Circuit noted that "no statute, regulation, or policy does, or indeed could, specifically prescribe a course of action for prison officials to follow in every prison uprising."

Turning to the second part of the discretionary function analysis, this case arises from the decisions by prison officials with respect to deploying resources and staff in response to an unfolding riot, which are the kinds of judgments the discretionary function exception was designed to shield. The U.S. Supreme Court has observed that "[w]hen the 'ever-present potential for violent confrontation and conflagration' . . . ripens into *actual* unrest and conflict, the admonition that 'a prison's internal security is peculiarly a matter normally left to the discretion of prison administrators' . . . carries special weight." *Whitley v. Albers*, 475 U.S. 312, 321, 106 S. Ct. 1078, 89 L. Ed. 2d 251 (1986) (citations omitted). It has been observed, and we agree, that "[p]rison officials' minute-to-minute decision making in the chaotic circumstances of a riot is a classic example of an activity requiring the exercise of discretion . . . ." *Buchanan v. U.S.*, 915 F.2d at 972. Wizinsky's testimony of his experience during the riots evidences the quickly changing situations that can arise during prison unrest requiring prison officials and response teams to exercise discretion. This is "precisely the kind of judgment the discretionary function exception is designed to shield." *Lambert v. Lincoln Public*

*Schools*, 306 Neb. 192, 202, 945 N.W.2d 84, 91 (2020). With respect to Wizinsky's challenges to the decisions by TSCI staff to prioritize and develop strategies to restore order and security during the riots, such claims fall within the discretionary function exception and are barred by the STCA.

## CONCLUSION

The district court correctly concluded that the discretionary function exception to the STCA shielded the State from liability from Wizinsky's claims based on the 2015 Mother's Day riots at TSCI. Accordingly, we affirm the judgment of the district court.

Affirmed.

Freudenberg, J., not participating.