IN THE NEBRASKA COURT OF APPEALS

## MEMORANDUM OPINION AND JUDGMENT ON APPEAL
### (Memorandum Web Opinion)

DOLTON ELECTRIC V. ICHTERTZ

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

DOLTON ELECTRIC, L.L.C., APPELLEE AND CROSS-APPELLANT,

V.

DOLF R. ICHTERTZ AND CAROL J. ICHTERTZ, APPELLANTS AND CROSS-APPELLEES.

Filed August 27, 2024.    No. A-23-885.

Appeal from the District Court for Hall County: PATRICK M. LEE, Judge. Affirmed.

Jared J. Krejci, of Smith, Johnson, Allen, Connick & Hansen, for appellants.

Robert S. Lannin, J. Michael Hannon, and Tyler R. Rademacher, of Baylor, Evnen, Wolfe & Tannehill, L.L.P., for appellee.

MOORE, RIEDMANN, and BISHOP, Judges.

MOORE, Judge.

## I. INTRODUCTION

Dolf R. Ichtertz and Carol J. Ichtertz appeal from the order of the district court for Hall County which entered judgment in favor of Dolton Electric, L.L.C., on its claim for unjust enrichment. Dolton Electric has cross-appealed, assigning error to the court's denial of its contractual claims and failure to award the full amount sought on Dolton Electric's unjust enrichment claim. We affirm.

## II. STATEMENT OF FACTS

On September 9, 2018, Dolton Electric and Salvador L. Mendoza, d/b/a Premier Plumbing, filed a complaint in the district court against the Ichtertzes, setting forth claims for suit on account stated, breach of contract, and foreclosure of a construction lien in connection with work they performed on a remodeling project at certain real property owned by the Ichtertzes in Grand Island,

Nebraska. Dolton Electric was the only plaintiff identified in a subsequent amended complaint, which added a claim for unjust enrichment. In the amended complaint, Dolton Electric sought judgment of $21,721.88 against the Ichtertzes.

Dolton Electric filed a second amended complaint on the morning of trial, alleging that on or about May 23, 2016, Jake's Construction and the Ichtertzes entered into an oral contract in which Jake's Construction was to provide construction services for a whole home remodel of the Ichtertzes' home, and that to complete that construction project, Jake's Construction engaged the services of Dolton Electric as a subcontractor. Dolton Electric alleged that it was hired to complete electrical wiring for lighting in various portions of the Ichtertzes' property and for various other electrical projects; that on June 21, it substantially performed all work "under the parties' remodeling contract," including work completed by Dolton Electric "at the specific request and control by" the Ichtertzes; and that it performed all work in a workmanlike manner. Dolton Electric alleged that on July 7, an invoice was provided to the Ichtertzes; that on September 13, the Ichtertzes notified Jake's Construction that they would not pay the invoice, which included Dolton Electric's invoiced amount; that a construction lien was subsequently filed against the property with respect to the remodeling contract; and that Dolton Electric was later assigned the rights of Jake's Construction under the lien. Finally, Dolton Electric alleged that it had fully performed the contract and that the Ichtertzes had failed to perform their obligations by failing to pay for labor and materials provided under the contract. In the second amended complaint, Dolton withdrew the construction lien foreclosure claim, amended its prayer for damages to $24,144.38, and included a request for pre-judgment interest in the suit on account stated claim.

Trial was held before the district court on August 3, 2023. The court received exhibits offered by the parties and heard testimony from Aaron Dolton (Aaron), the owner of Dolton Electric; the Ichtertzes; and Jim Hoag, an electrician who worked on the remodeling project prior to Dolton Electric.

The Ichtertzes have owned the property in question since December 1999, and they resided there at the time of trial. Between about 2002 and 2004, the Ichtertzes undertook significant renovation of the property. During the renovation, they stayed at a house they owned next door. The Ichtertzes directly hired various contractors to work on remodeling the property, including someone who did insulation and drywall work, and electrician Jim Hoag. Sometime between 2011 and 2013, the Ichtertzes engaged Jeremy Jakubowski, the owner of Jake's Construction, "to do the bathrooms and sequential stuff" at the property. Jakubowski and his father had previously "put a brick wall in" at the property and had done work on other property owned by the Ichtertzes. Once Jakubowski began work on the bathrooms on the property, the scope of the remodeling project expanded to include other areas of the house. Dolf viewed Jake's Construction as a general contractor, noting that Jakubowski "had the permits and stuff and he was bringing in the subcontractors," but Dolf did not recall having "anything beyond that formally," like a written contract with Jake's Construction. Jake's Construction remained on the project until late summer 2016.

For electrical work on the remodeling project, the Ichtertzes initially hired Hoag, who had done other work for them in the past. Although Hoag completed "[q]uite a bit" of electrical work at the Ichtertzes' house, at some point he left the project and Dolton Electric took over the electrical work. The witnesses presented conflicting testimony about the transition from Hoag to Dolton

Electric. When asked about how Dolton Electric became involved in the project in 2016, Dolf testified that they "were trying to get the project done" and were told by Jakubowski that Hoag was too busy to complete the project. Carol testified that Jakubowski told her "Hoag wasn't available." According to Aaron, the Ichtertzes "requested a new electrician that had good ideas, better ideas, new modern ideas, than the electrician they had that was wiring the house at the time." Hoag's testimony about the transition is less clear. Hoag testified that he "never really stopped" his work prior to the transition, but that at some point he saw Aaron at the house and "got the impression" Aaron wanted to finish the project, which he "didn't have a problem with . . . because [he] was kind of busy anyway."

Jakubowski, who had been a high school classmate of Aaron's, introduced Aaron to the Ichtertzes. At the time, Aaron was based in Lincoln, Nebraska, did not have a driver's license, and had to have his apprentice drive him. Dolf testified that he explained to Jakubowski that he was not going to pay for fuel or travel since there were local service providers Jakubowski could hire. Carol also testified that she told Jakubowski they would not pay for travel.

After the introduction by Jakubowski, Aaron met with the Ichtertzes and "went over some ideas that [he] had that [he] would do if [he] was the electrician on the job." According to Aaron, the Ichtertzes "agreed" and said, "you've got the job," and "[t]here was a hand shake." When Aaron left, his understanding was that he had been hired by the Ichtertzes to complete the electrical duties on the project. Aaron stated that Jakubowski was "just the guy doing the main construction work," "not the one to say, hey, you have the job," and testified that he "had to be hired by [the Ichtertzes]." Aaron testified that before starting work on the project, he also called Hoag "to make sure that [he] was not stepping on [Hoag's] toes or overstepping [his] boundaries," to see if Hoag was "okay with [Dolton Electric] taking it over," and to let Hoag know he did not "want to take a job from him." Aaron testified that Hoag told him, "yes, the job is yours, go for it." Hoag did not remember receiving such a phone call.

There was no written contract between Dolton Electric and the Ichtertzes (or between Dolton Electric and Jake's Construction). Aaron did not provide a quote or estimate to the Ichtertzes for the work he was to perform, but he testified to his belief that he and Dolf formed an oral contract during their first meeting, the scope of which was expanded during the course of Dolton Electric's work on the project by text messages, notes, and voicemails he exchanged with the Ichtertzes. In contrast, Dolf testified that he did not have an impression he was forming a contract with Dolton Electric, either through the initial meeting with Aaron or through subsequent voicemails or notes, as he thought Dolton Electric was being brought in as a subcontractor for Jake's Construction.

In March 2016, shortly after Aaron's initial meeting with the Ichtertzes, Dolton Electric began work on the remodeling project, which was "supposed to be a two- to four-month job." Aaron was asked about the state of the electrical system when Dolton Electric began work. He testified that Hoag had completed "just a rough-in" with "basic wiring in the walls before drywall." He described it as "the beginning states of the electrical," where "boxes were in position," "[w]ire was pulled," but "[n]othing was put together yet." In his testimony, Hoag acknowledged that he had the wiring "taken care of" before Dolton Electric began work. Hoag testified that he "had everything ready to go," that "[t]he fixtures were there and the plugs and switches and all that," and that Dolton Electric "just kind of finished up that part." Hoag, who visited the residence after

Dolton Electric's work was done, was asked about "what work Dolton Electric finished out." He responded that "it was a matter of maybe four of five fixtures, some under-cabinet lighting, and maybe just some recessed lighting." He also noted that Dolton Electric "had trims that had to be put in." Hoag described the work completed by Dolton Electric as "[n]othing really major." In Dolf's testimony about the work left to complete when Dolton Electric started, Dolf referenced work in the kitchen, nook, and powder room, including the installation of sockets, various types of switches to operate the lights, trim fixtures with lights on the ceiling; fixtures in the upstairs bathroom; and some lights in the basement.

During Dolton Electric's time on the remodeling project, Aaron and his apprentice traveled from Lincoln to and from Grand Island for two-day intervals of work. Aaron's apprentice was with him the entire time he worked on the remodeling project. They accessed the residence using a garage code that the Ichtertzes set up and "shared with the contractors." Aaron testified to his belief that Jake's Construction was not the general contractor on the project. He considered Jakubowski "more of a middle man" and testified that Jake's Construction "in no way, shape or form . . . controlled" the work performed by Dolton Electric. The Ichtertzes communicated directly with both Jake's Construction and Dolton Electric during the project through phone calls, text messages, and some in-person meetings. Aaron described Dolf as "the main decision maker," and he noted that Dolf would leave "sticky notes all over the house on what he saw that night when he was there" to communicate things that needed to be "fixed." Some of the notes left by Dolf applied to Dolton Electric's work, communicating issues like flickering LED lights, lighting that was the "wrong temperature," or "missing outlets here and there that weren't ready to be installed."

Aaron testified that the scope of Dolton Electric's work on the project changed "[c]onstantly." He indicated that the Ichtertzes' preferences on the tile color in the upstairs bathroom required Dolton Electric to "essentially redo the lighting four times in that room." He also noted other changes made by the Ichtertzes to the project, including the location of the laundry room and the addition of a wine cellar in the basement. Over the course of the project, Dolton Electric also became responsible for adding deck lighting, installing a water purification system, adding LED lighting for under-cabinet and directional lighting, and installing "wall wash lights," doing "rough-in for future decks being built," "all stuff not in the original scope" of the project. Aaron also testified that given the effects the Ichtertzes wished to achieve in the look of their residence and some of the materials used by other contactors, Dolton Electric's work took longer to complete than normal.

During Dolton Electric's time working on the project, Aaron purchased materials at the Ichtertzes' request and paid for them himself. Aaron testified that he was "[v]ery excited" to work on the project involving "a very cool house, a very old house," that was "[k]ind of like iconic" in Grand Island. Aaron also found the project "exciting" because of the "expensive, nice things that [the Ichtertzes] were putting in." He testified, "[W]e wanted to do a really good job and make it look as nice as possible for what they were putting into the house," and he indicated that he and his apprentice "work[ed] hard" on the project. A message from Dolf to Aaron at the end of May informed Aaron that Dolf was "happy with what you have been accomplishing." According to Aaron, the Ichtertzes never raised any complaints about the quality of Dolton Electric's work. Hoag, who observed the work completed by Dolton Electric afterwards, testified that Dolton Electric's work "looked satisfactory" and that he "didn't have a problem with it."

At some point in 2016, however, the Ichtertzes became unhappy with the progress and the quality of work by Jake's Construction. At trial, Dolf described "most of the work" done on the property by Jake's Construction as "quality work," but he also felt that it was "[v]ery slow." One day when Aaron and his apprentice showed up to work on the project, "the locks were changed and the door code was changed." According to Aaron, based on subsequent conversations with the Ichtertzes, they were primarily unhappy with "some of [Jakubowski's] work, his finish work," but they "just fired everybody," including Dolton Electric. As to the work yet to be completed by Dolton Electric at that point, Aaron testified, "I think there was still a couple of things in August that they were wanting," including "outlets in the nook," "the front porch by the driveway" was not completed and for which Dolton Electric still had the material, and possibly "GFIs" were needed in the bathroom. Aaron agreed that it had been "[g]enerally" a March to August 2016 project for Dolton Electric.

Given the anticipated 2 to 4 month duration of the project, Dolton Electric had not billed the Ichtertzes for its work up to the point when the Ichtertzes locked out the contractors. Under the circumstances, Dolton Electric and the other contractors "thought it would be easier and simplified to just send one bill with everybody's bill on it." Aaron testified that the decision to invoice the Ichtertzes through Jake's Construction was not "saying that [Jake's Construction] is the general and [Jakubowski] is the one in charge of us." They just "simplified it to send one bill, send one check, and then [they would] figure it out from there." The invoice from Jake's Construction to the Ichtertzes, dated July 7, 2016, included line items for work completed by Jake's Construction ($10,400) and material used ($1,108.97); labor by Dolton Electric (170 hours at $85 per hour for a total of $14,450); materials used by Dolton Electric ($8,810.48); "[m]oney previously held from Premier Plumbing" ($2,000); and a 10 percent "[g]eneral [c]ontractors fee" ($3,676.94) for a total invoiced amount of $40,446.39. The invoice directed the Ichtertzes to make all checks payable to "Jeremy Jakubowski."

The Ichtertzes never paid the final invoice sent by Jake's Construction. According to Dolf, the Ichtertzes "had already paid for segments of this all along." He testified that they had previously paid Jake's Construction $180,000 and that they expected Jake's Construction to pay its subcontractors with that money. Carol's testimony also reflected this expectation. The record includes an exhibit containing multiple other invoices from Jake's Construction to the Ichtertzes between 2014 and 2016. The only reference to Dolton Electric in this exhibit is in an invoice dated April 3, 2016, which references a consult with Dolton Electric as one of the multiple items billed on that date.

The Ichtertzes sent a letter, dated September 13, 2016, to Jakubowski, informing him that they would not be making any more payments to him "for construction services alleged to have been performed or for those performed in a substandard and unacceptable fashion." The letter indicated, "This includes excessive fees for your subcontractors (plumbing and electrical subcontractors)," and requested the return of all keys to the Ichtertzes residence. The letter also alleged that there was "lots of additional work that [Jakubowski] ha[d] created for [the Ichtertzes] to rectify."

After the submission of the charges billed through the invoice sent by Jake's Construction to the Ichtertzes, Aaron submitted an invoice directly to the Ichtertzes for Dolton Electric's charges and began negotiating with them to resolve the dispute. Dolton's direct invoice to the Ichtertzes,

dated August 4, included charges of $14,450 for labor (170 hour at a rate of $85), materials charges totaling $8,460.48, and a "truck and gas charge" of $350, for a total balance of $23,260.48. It stated that all work was completed and billed from April 1 through August 1, 2016. A subsequent invoice added a "credit card payment charge" of $883.90, bringing the total balance due to $24,144.38.

Dolf testified that he felt the invoices sent by Dolton Electric did not accurately reflect the materials used and hours worked. Carol also testified that she felt the charges from Dolton Electric were excessive. At some point, Dolf sent Aaron an email expressing that the invoices contained "inflated charges for hours worked and cost of supplies used to complete the electrical already installed by [Hoag]. . ." The email suggested that the work completed by Dolton Electric might have taken "possibly 4 days" and asked Aaron to "[p]rovide all invoices." In response, Aaron sent them "all copies of invoices, all dates and times, travel time," giving them "every single bit of information that [he] had so they could understand the bill better." He testified that Dolf's email "kind of proves that even [the Ichtertzes] didn't understand the scope of work that was going on at the house" and noted that the email did not mention "multiple things that [Dolton Electric was] working on." He also testified that it would have been "[j]ust impossible" to complete the amount of work done by Dolton Electric on the project in 4 days.

According to Dolf, after the Ichtertzes fired Jake's Construction, other individuals finished the work, and corrected prior work, on the house. Although Dolf affirmed that the work done after Jake's Construction was fired "cost a significant amount of money," the Ichtertzes did not present evidence about specific financial impact of the additional work, or corrections, electrical or otherwise, required after Jake's Construction was fired. Dolf agreed that at the time of trial, the Ichtertzes were still using "most" of the "electrical stuff" installed by Dolton Electric. Testimony from Dolf and Aaron confirms that the Ichtertzes never paid any money directly to Dolton Electric for its work.

On October 10, 2023, the district court entered an order ruling on Dolton Electric's claims. After outlining the evidence, the court first addressed the Ichtertzes' assertion that Dolton Electric was a subcontractor of Jake's Construction, and any relief should come from Jake's Construction rather than from them. The court stated that while Aaron repeatedly testified that Dolton Electric was a contractor hired by the Ichtertzes, rather than a subcontractor of Jake's Construction, the evidence did not support his testimony. The court noted the contradiction between Aaron's testimony and Dolton Electric's pleadings, which alleged that to complete the construction project in question, Jake's Construction engaged the services of Dolton Electric as a subcontractor. The court found that this statement in Dolton Electric's complaint was a judicial admission and that Dolton Electric had conceded for purposes of litigation the fact that it was a subcontractor. The court noted other evidence supporting its conclusion that Dolton Electric was a subcontractor on the project, including evidence showing Jakubowski was the "middle man" between Aaron and the Ichtertzes, the fact that Dolton Electric never provided the Ichtertzes with a quote or estimate for its work, and Dolton Electric's submission of its billing through the final invoice sent by Jake's Construction.

The district court then addressed the specific claims raised by Dolton Electric. It rejected the suit on account stated and breach of contract claims, finding in favor of the Ichtertzes on those claims. The court found in Dolton Electric's favor on its unjust enrichment claim, finding that Dolton Electric met its burden to prove unjust enrichment regarding the reasonable value of the

materials it used on the project, which the court determined to be $8,460.48. The court also considered Dolton Electric's request for labor of 170 hours totaling $14,450, a "truck and gas charge" of $350, and a credit card payment charge of $883.90. The court did not find Dolton Electric's assertions about total labor costs credible. However, as the materials that provided benefit to the Ichtertzes required some amount of labor to enable their use by the Ichtertzes, the court found it would be inequitable and unconscionable for the Ichtertzes to retain the benefit of the value of the work performed but refuse to compensate Dolton Electric. The court found a reasonable labor cost "based solely on the minimal evidence presented" to be 104 hours (13 days of 8 hours per day) at a rate of $50 per hour for a total labor cost of $5,200. The court found that Dolton Electric had not met its burden of proving unjust enrichment with respect to the "truck and gas" charge and the credit card payment fee. The court entered judgment on behalf of Dolton Electric against the Ichtertzes in the amount of $13,660.48 plus post-judgment interest at a rate of 7.494 percent, as well as costs.

## III. ASSIGNMENTS OF ERROR

The Ichtertzes assert, restated, that the district court erred in finding in favor of Dolton Electric on its unjust enrichment claim.

On cross-appeal, Dolton Electric asserts, restated, that the district court erred in (1) denying its contractual claims and (2) failing to award the full amount sought on its unjust enrichment claim.

## IV. STANDARD OF REVIEW

An account stated is a contract to pay the stated sum. *Andrews Electric Co. v. Farm Automation, Inc.*, 188 Neb. 669, 198 N.W.2d 463 (1972). A suit for damages arising from breach of a contract presents an action at law. *132 Ventures v. Active Spine Physical Therapy*, 313 Neb. 45, 982 N.W.2d 778 (2022). A claim for unjust enrichment is a quasi-contract claim for restitution. *Id.* Any quasi-contract claim for restitution is an action at law. *Zook v. Zook*, 312 Neb. 128, 978 N.W.2d 156 (2022).

In a bench trial of an action at law, the trial court is the sole judge of the credibility of the witnesses and the weight to be given their testimony; an appellate court will not reevaluate the credibility of witnesses or reweigh testimony but will review the evidence for clear error. *Benjamin v. Bierman*, 305 Neb. 879, 943 N.W.2d 283 (2020). The trial court's factual findings have the effect of a jury verdict, and an appellate court will not disturb those findings unless they are clearly erroneous. See *Nebraska Journalism Trust v. Dept. of Envt. & Energy*, 316 Neb. 174, 3 N.W.3d 361 (2024).

In reviewing a judgment awarded in a bench trial of a law action, an appellate court does not reweigh evidence, but considers the evidence in the light most favorable to the successful party and resolves evidentiary conflicts in favor of the successful party, who is entitled to every reasonable inference deducible from the evidence. *Wizinsky v. State*, 308 Neb. 778, 957 N.W.2d 466 (2021).

## V. ANALYSIS

The Ichtertzes assign error to the district court's finding in favor of Dolton Electric on its unjust enrichment claim. On cross-appeal, Dolton Electric assigns error both to the court's denial of its contractual claims as well as to the amount awarded on its unjust enrichment claim.

Unjust enrichment claims are viable only in limited circumstances, and the terms of an enforceable agreement normally displace any claim of unjust enrichment within their reach. *Humphrey v. Smith*, 311 Neb. 632, 974 N.W.2d 293 (2022). Though contract claims supersede unjust enrichment claims, a plaintiff is permitted to allege both, and when a plaintiff elects to do so, a court should address the contract claim first. *Id.* Accordingly, we first address Dolton Electric's assignment of error on cross appeal with respect to its contractual claims before turning to the parties' assigned errors with respect to unjust enrichment.

### 1. CONTRACTUAL CLAIMS

On cross-appeal, Dolton Electric asserts that the district court erred in denying its contractual claims (suit on an account stated and breach of contract). It argues that the evidence adduced at trial reflected the existence and breach of an implied contract between the parties.

### (a) Account Stated

An "account stated" is an agreement between persons who have had previous dealings determining the amount due by reason of such transactions. *Crossman & Hosford v. Harbison*, 25 Neb. App. 849, 915 N.W.2d 101 (2018). In rejecting this claim, the district court observed that in its operative complaint, Dolton Electric alleged the formation of an oral contract for labor and materials for electrical services, rather than alleging that an account balance was agreed upon by the parties. The court also noted the evidence presented at trial that there was no agreement between the parties as to the amount owed, as well as the evidence showing that neither party had any business dealings prior to the present matter. The court concluded that Dolton Electric failed to meet its prima facie burden to show the existence of an account stated and found in favor of Ichtertzes on Dolton Electric's account stated claim.

Dolton Electric has not specifically assigned error to the district court's findings with respect to its first claim. Although Dolton Electric references its account stated claim in arguing its first assignment of error on cross-appeal, its arguments focus on the court's findings with respect to its second claim, the breach of contract claim. Accordingly, we do not discuss its account stated claim further. To be considered by an appellate court, an alleged error must be both specifically assigned and specifically argued in the brief of the party assigning the error. *Uhrich & Brown Ltd. Part. v. Middle Republican NRD*, 315 Neb. 596, 998 N.W.2d 41 (2023). An appellate court is not obligated to engage in an analysis that is not needed to adjudicate the controversy before it. *SID No. 596 v. THG Development*, 315 Neb. 926, 2 N.W.3d 602 (2024).

### (b) Breach of Contract

In its second claim, Dolton Electric alleged that it had performed all of the conditions, covenants, and promises required by the oral remodeling contract and that the Ichtertzes had breached the contract by failing to pay. The district court rejected this claim, finding no evidence of a meeting of the minds between Dolton Electric and the Ichtertzes and nothing to suggest an

implied contract that had simply not been stated in words. On appeal, Dolton Electric assigns error to this finding and argues that the evidence reflected the existence of an implied contract between the parties and breach of that contract by the Ichtertzes.

To create a contract, there must be both an offer and an acceptance; there must also be a meeting of the minds or a binding mutual understanding between the parties to the contract. *Slama v. Slama*, 313 Neb. 836, 987 N.W.2d 257 (2023). A contract may be express, implied, written, or oral. *Armstrong v. Clarkson College*, 297 Neb. 595, 901 N.W.2d 1 (2017). An implied in fact contract arises where the intention of the parties is not expressed in writing but where the circumstances are such as to show a mutual intent to contract. *Id.* A binding mutual understanding or meeting of the minds sufficient to establish a contract requires no precise formality or express utterance from the parties about the details of the proposed agreement; it may be implied from the parties' conduct and the surrounding circumstances. *Moore v. Nebraska Acct. & Disclosure Comm.*, 310 Neb. 302, 965 N.W.2d 564 (2021). The determination of the parties' intent to make a contract is to be gathered from objective manifestations—the conduct of the parties, language used, or acts done by them, or other pertinent circumstances surrounding the transaction. *Id.* If the parties' conduct is sufficient to show an implied contract, it is just as enforceable as an express contract. *Id.* The determination of the parties' intent to make a contract is normally a question of fact. *Id.*

There was no written contract between Dolton Electric and the Ichtertzes; rather, Dolton Electric argues that an oral contract was formed during Aaron's first meeting with Dolf to discuss the project and that this oral contract was expanded through subsequent conversations and messages between Aaron and the Ichtertzes. We note, as did the district court, that Aaron did not provide any quotes or estimates during this first meeting, which did not appear to define the scope of work to be completed. The court also noted Aaron's call to Hoag "to get his blessing to take over the job" after the meeting with the Ichtertzes and Dolf's testimony that he never had the impression he was entering into a contract with Dolton during the initial meeting and thought Dolton Electric was a subcontractor working for Jake's Construction.

In denying this claim, the district court reasoned:

[Aaron] was unable to articulate specific terms and conditions of an oral contract between [Dolton Electric] and [the Ichtertzes]. In other words, he failed in his burden to establish that an enforceable contract existed in that there was no specific meeting of the minds between [the parties] other than his subjective statement of intent retrospectively. Additionally, there is no evidence to suggest that there was an implied contract that . . . simply had not been expressed into words.

Clearly, there was an understanding between [Aaron] and [Dolf] following the initial meeting that Dolton [Electric] would be added to an already large slate of subcontractors to be managed by Jake's [construction]. His status as a subcontractor . . . has already been determined by the [c]ourt. As the [p]laintiff, Dolton [Electric] elected not to pursue a case against Jake's [Construction] or even [e]licit any testimony from Jakubowski to establish the existence of any contract relating to his electrical services that in any way binds the Ichtertzes, written or oral. Based upon the evidence presented, there was no separate otherwise binding oral agreement that would supplant the otherwise

- 9 -

general rule of law that there is no privity of contract between a property owner and a subcontractor.

The district court's factual findings with respect to whether Dolton Electric formed a contract with the Ichtertzes are not clearly erroneous. And, as the court noted, Nebraska law provides that in the absence of a binding agreement, express or implied, there is no privity of contract between a subcontractor and a landowner who employs the general contractor who hired the subcontractor. *Lindsay Mfg. Co. v. Universal Surety Co.*, 246 Neb. 495, 519 N.W.2d 530 (1994). The court did not err in finding the evidence did not establish the existence of a binding, implied contract between Dolton Electric and the Ichtertzes or in entering judgment for the Ichtertzes on Dolton Electric's breach of contract claim.

## 2. UNJUST ENRICHMENT

### (a) Viability of Claim

The Ichtertzes assert that the district court erred in finding in favor of Dolton Electric on its unjust enrichment claim. They argue that Dolton Electric's claim was not viable due to (1) the existence of the general contract and subcontract with Jake's Construction which covered the same subject matter as Dolton Electric's unjust enrichment claim and (2) the principle that a subcontractor may not recover from an owner based on an unjust enrichment claim.

The principle of quantum meruit is a contract implied in law theory of recovery based on the equitable doctrine that one will not be allowed to profit or enrich oneself unjustly at the expense of another. *Sorenson v. Dager*, 8 Neb. App. 729, 601 N.W.2d 564 (1999). Where benefits have been received and retained under circumstances that it would be inequitable and unconscionable to permit the party receiving them to avoid payment therefor, the law requires the recipient to pay the reasonable value of the services. *Id.* The issue of unjust enrichment is a question of fact. *Id.*

An express contract claim supersedes a quasi-contract claim arising out of the same transaction to the extent that the contract covers the subject matter underlying the requested relief. *DH-1, LLC v. City of Falls City*, 305 Neb. 23, 938 N.W.2d 319 (2020). If recovery on an express contract theory proves not to be viable, there are circumstances in which recovery may still be had on an unjust enrichment or a quasi-contract basis. *Bloedorn Lumber Co. v. Nielson*, 300 Neb. 722, 915 N.W.2d 786 (2018). For example, the Nebraska Supreme Court has held that where there has been partial performance of a contract and the other party has accepted and retained the benefits thereof, the party partially performing is entitled to recover the reasonable or fair value of such performance, subject to the reciprocal right of the other party to recoup such damages as he or she has suffered from the failure to perform. See *RM Campbell Indus. v. Midwest Renewable Energy*, 294 Neb. 326, 886 N.W.2d 240 (2016).

The district court found that there was no written or oral agreement between the parties or between either the Ichtertzes or Dolton Electric and Jake's Construction regarding the remodeling project generally or the electrical work specifically. In addressing Dolton Electric's unjust enrichment claim, the district court found no dispute that Dolton Electric performed work at and made improvements to property owned by the Ichtertzes using materials placed within the home which provided a benefit to the Ichtertzes that they continued to enjoy at the time of trial. The court found that Dolton Electric did not start its work until the spring of 2016, that no money was paid

to Dolton Electric for its work, and that any payment to Jake's Construction by the Ichtertzes did not include Dolton Electric's work. We find no error in the district court's conclusion that there was no contract covering the same subject matter as Dolton Electric's unjust enrichment claim or in its conclusion that the Ichtertzes received and retained a benefit from Dolton Electric under circumstances where it would be inequitable and unconscionable to permit them to avoid payment for that benefit.

The district court also rejected the Ichtertzes' argument that Dolton Electric's status as a subcontractor shielded them from liability. In reaching that conclusion, the court relied on *Sorenson v. Dager, supra*, which does not squarely address the issue of whether a subcontractor can recover against an owner on an unjust enrichment claim but addressed a subcontractor's right to a lien for the reasonable value of the labor performed and materials furnished to the property owner regardless of whether the subcontractor had substantially performed its contract with the general contractor.

In its brief on appeal, Dolton Electric directs out attention to *ABC Elec., Inc. v. Nebraska Beef, Ltd.*, 249 F.3d 762 (8th Cir. 2001). In that case, Nebraska Beef hired a general contractor to renovate and expand its facility. The general contractor subcontracted with ABC Electric for the electrical work on the project. Problems developed over the course of the project, and ABC submitted invoices for the costs of excessive overtime and extra work, which Nebraska Beef refused to pay. Nebraska Beef eventually removed ABC from the project. ABC filed suit against the general contractor and Nebraska Beef, seeking damages for unpaid work. Nebraska Beef and the general contractor, who was later dismissed from the suit by ABC, counterclaimed for expenses incurred in completing the work. After the general contractor's dismissal from the case, the trial court concluded there was no express or implied in fact contract between Nebraska Beef and ABC and dismissed the remaining breach of contract claims. A jury returned a verdict in favor of ABC on its quantum meruit and promissory estoppel claims. Nebraska Beef appealed and ABC filed a cross-appeal.

On appeal, the Eighth Circuit determined that under the Nebraska law of quantum meruit, ABC was entitled to recover the reasonable value of electrical services that it performed for Nebraska Beef's benefit in circumstances that would make it inequitable for Nebraska Beef not to pay. The Eighth Circuit disagreed with Nebraska Beef's contention that ABC, an unpaid subcontractor, could not recover from Nebraska Beef, the project owner, because they were not in privity of contract. The Court noted that "[re]covery under quantum meruit does not require privity of contract." *Id.*, 249 F.3d at 765. The Court found that the evidence established Nebraska Beef's direct supervision of the part of the project that renovated the existing facility and that Nebraska Beef, rather than the general contractor, controlled the entire project, and paid ABC directly for work performed. The Court also observed that ABC's quantum meruit claim did not include work for which Nebraska Beef had paid the general contractor. Under those circumstances, the Eighth Circuit concluded that the Nebraska Supreme Court would apply the principles of quantum meruit to permit an unpaid subcontractor to recover from a project owner. The Eighth Circuit then noted that while a party may not recover under quantum meruit for work it was obligated to perform under an express contract, a quantum meruit claim may supplement an express contract by seeking reasonable compensation for work not covered by the contract. The Court then interpreted the

subcontract between ABC and the general contractor to determine what work was covered by that contract.

In the present case, there were no written contracts between the parties or between Jake's Construction and either of the parties. The district court's determination of Dolton Electric's subcontractor status was made primarily on the basis of the judicial admission in Dolton Electric's complaint. However, there is nothing in the record to suggest any control over Dolton Electric's work by Jake's Construction or to define the scope of any subcontract between Jake's Construction and Dolton Electric. On the contrary, the record establishes a certain amount of control over the project by the Ichtertzes, including the electrical work performed by Dolton Electric. The district court determined that Dolton Electric's work occurred after any payments were made by the Ichtertzes to Jake's Construction. Dolton Electric did not bill for its work prior to the final invoice sent by Jake's Construction to the Ichtertzes, and no payments have been made to Dolton Electric by the Ichtertzes or Jake's Construction. Under the circumstances of this case, we find no error in the district court's finding in favor of Dolton Electric on its unjust enrichment claim.

(b) Amount of Award

In its cross-appeal, Dolton Electric asserts that the district court erred in failing to award the full amount sought on its unjust enrichment claim. The court reviewed the evidence and determined that the reasonable value of the materials used by Dolton Electric in the remodeling project was $8,460.48. This was the amount requested by Dolton Electric in its billing, and it does not take issue with that finding by the court. The court, however, rejected Dolton Electric's claims for the "truck and gas" charge and the "credit card payment" charge and reduced the amount awarded for Dolton Electric's labor from that claimed by Dolton Electric.

Dolton Electric claims labor charges based on 170 hours billed at $85 per hour ($50 per hour for Aaron's work and $35 per hour for the apprentice). Twenty-eight and a half hours of the 170 hours billed were travel time to and from Lincoln. An invoice sent by Dolton Electric to the Ichtertzes on August 4, 2016, sought $12,027.50 in labor expenses after removing this travel time, leaving 141.5 hours of labor. In determining how much to award Dolton Electric for labor costs on its unjust enrichment claim, the district court reviewed the limited evidence available, noting a communication from Aaron to the Ichtertzes indicating 13 trips to Grand Island for 19 days of work. The court observed that Dolton Electric's removal of travel time reduced the requested labor hours to 141.5, which based on an 8 hour day would amount to "a little over 17 and a half, rather than 19" days. The court also noted Dolton's testimony that he did not provide quotes or estimates to the Ichtertzes and the Ichtertzes' testimony that they told Jakubowski they would not pay for any travel, as well as Dolf's testimony that he had not been aware of the apprentice's work on the project until these proceedings. The court stated that "[w]hile clearly some amount of labor was necessary to install the materials used in [the property], the evidence establishes that there was no agreement as to an hourly rate between Dolton [Electric] and Ichtertzes or approval for additional personnel beyond [Aaron] which would increase the hourly rate." Based upon "the unsubstantiated hours worked," the court did not find Dolton's assertions of the total labor costs credible, especially given the itemization in the record of the days and hours worked from Jake's Construction. The court declined to impute that same itemization of hours to Dolton Electric. Given its conclusion that the materials used by Dolton Electric on the project that had provided benefit to the Ichtertzes

required some amount of labor to install, the court concluded it would be inequitable and unconscionable for the Ichtertzes to retain the benefit of the value of the work performed but refuse to compensate Dolton Electric for its labor. The court found a reasonable labor cost, based on the minimal evidence presented, to be 104 hours (13 days of 8 hours per day) Dolton's rate of $50 per hour for a total labor cost of $5,200. Given the minimal evidence as to the actual hours worked by Dolton Electric, the Ichtertzes' testimony that they told Jakubowski they would not pay for travel, their lack of knowledge of the apprentice's involvement until these proceedings, and the court's determinations as to credibility, we find no error in its determination of the labor costs to be awarded on the unjust enrichment claim.

As to the truck and gas charge, Aaron testified that he removed that charge from his billing during his negotiations with the Ichtertzes. Given the removal of the travel time from Dolton Electric's labor costs, we find no error in the district court's rejection of the truck and gas charge.

Finally, with respect to the credit card charge of $883, although Aaron's testimony established that he used a company credit card to purchase materials for the project, the record does not clearly establish what was represented by that $883 amount. The court did not err in rejecting the credit card payment charge.

## VI. CONCLUSION

The district court did not err in entering judgment in favor of the Ichtertzes on Dolton Electric's suit on account stated and breach of contract claims, in finding in favor of Dolton Electric on its unjust enrichment, or in the amount awarded.

AFFIRMED.